Opinion
 

 WIENER, Acting P. J.
 

 Katherine S. Harrison (Katherine) appeals portions of the August 23, 1982, interlocutory judgment dissolving her 65-month marriage (Feb. 2, 1974 to June 27, 1979) to John Eugene Harrison (Eugene) and the April 22, 1983, order terminating spousal support, denying attorney fees and setting the value of stock and dividends from the Loral Corporation, Eugene’s employer. We reject Katherine’s challenge to the court’s valuation of stock obtained through Eugene’s exercise of the Loral stock options. We conclude the court’s formula establishing the community interest in the Loral stock was within its equitable discretion and Katherine’s acceptance of the cash benefits of the order precludes her receiving her community interest in shares of stock. We also decide the court acted within its discretion in terminating spousal support; erred in ordering a stepdown amount of spousal support for a nine-month period, in granting Eugene an
 
 Epstein
 
 credit (see
 
 post,
 
 p. 1229) and in denying attorney’s fees. We therefore affirm in part, reverse and modify in part, and remand for further proceedings consistent with this opinion.
 

 I
 

 The Stock Options
 

 For convenience and brevity we include only the relevant portion of the procedural and factual background in our discussion of the respective issues. We start with what we believe is the principal issue: whether the court properly characterized and valued Katherine’s community interest in the Loral stock.
 

 A
 

 This case was tried in fits and starts. The first two days of trial on Eugene’s second amended petition for dissolution were on November 26, 1980, and December 1, 1980. Katherine then successfully moved to bifurcate the issues of Eugene’s deferred compensation and Loral stock options so she could depose Loral’s vice-president and secretary in New York. Trial started again on February 17, 1981, and proceeded through February 19. The deposition was received in evidence. The court found the stock options were “golden handcuffs,” granted by Loral to encourage Eugene to stay with the company. On February 19, 1981, following oral argument the court asked
 
 *1213
 
 counsel to file briefs on the stock option and tax issues. The case was to be set for further argument.
 

 After reviewing the supplemental briefs the court apportioned the stock options in accordance with a formula based on the following factors: the time Eugene worked for Loral
 
 after
 
 the granting of each option, the date on which Eugene’s right to exercise the option vested, and the date of separation. The formula is set out in full below.
 
 [1]
 

 On April 22, 1983, the court heard additional testimony on the value of the parties’ community interest in the stock as determined by the formula.
 

 The evidence presented during the bifurcated proceedings which occurred in 1980-1981 established Eugene had four option agreements to purchase Loral stock. Option No. 1, dated January 29, 1975, was a
 
 qualified
 
 1971 stock option plan giving Eugene the right on specified dates to buy 2,500 shares of Loral stock in 25 percent increments at $3.56 a share. Before separation Eugene exercised his rights under this option in January 1977, 1978 and 1979. He exercised the balance of his last option right in January 1980. Eugene received 5,000 shares reflecting a two-for-one stock split.
 

 Options Nos. 2, 3, and 4 were
 
 nonqualified
 
 stock option agreements issued under Loral’s 1976 and 1978 stock option plans. Each option was granted before separation. Under each option Eugene had the immediate right to buy stock. Any stock purchased, however, was subject to certain restrictions including forfeiture of the stock depending upon events described in greater detail later in this opinion.
 

 
 *1214
 
 At trial Betty White, a certified public accountant, testified for Eugene on the meaning of the stock options. She also testified at the April 22, 1983, hearing from an exhibit she prepared containing details of the respective options and the value of the stock applying the formula. At the conclusion of that hearing the court found White’s exhibit properly applied the formula contained in the interlocutory judgment of dissolution. At all times Katherine’s efforts at valuation focused on the stock rather than the options. The court ordered “the value of the community interest [in the Loral stock] is $85,703 minus imbalance [and] credits.” On May 22, 1983, Eugene paid Katherine $67,142 pursuant to the court’s order representing the balance of Katherine’s community interest in the stock and dividends obtained by exercise of the stock options.
 

 B
 

 Katherine incorrectly argues the court erred when it decided “the only proper way to divide the stock option benefits is on a time basis.” Although the formula is technically incorrect because it fails to recognize the distinction between qualified and nonqualified options as well as the differences between the options themselves and stock purchased pursuant to the options, we nonetheless agree with the trial court that a time formula was proper. We first consider the difficulties created by these semantic inaccuracies.
 

 Under option No. 1 Eugene had the right to buy nonforfeitable Loral stock in increments of 25 percent on specified dates extending over a period of four years; the option could not be exercised until the specified dates occurred. Option Nos. 2, 3, and 4 gave Eugene different rights. Under these options he could purchase 100 percent of the stock covered by the option on the day the option was granted. However, any stock issued pursuant to the nonqualified options was restricted. The restrictions provided that stock issued to any employee upon exercise of the options was to be forfeited to the corporation if the employee were terminated for cause or were to leave voluntarily without corporate consent. The forfeiture provisions lapsed in 20 percent increments starting two years after the stock was issued. The forfeiture provisions did not apply if the employee died, was terminated without cause, or left corporate employment voluntarily with corporate consent.
 

 In family law cases involving retirement benefits “vested” has been defined as “a pension right which is not subject to a condition of forfeiture if the employment relationship terminates before retirement.”
 
 (In re Marriage of Brown
 
 (1976) 15 Cal.3d 838, 842 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164].) Eugene’s nonqualified stock options pre
 
 *1215
 
 sent an analagous situation. Those options gave Eugene the vested unconditional right to buy Loral stock on the date the options were issued subject to the restrictions described above on any stock purchased. Because Eugene could lose some or all of the stock if he were terminated for cause or were to resign without corporate consent any restricted stock he purchased was not vested. Only the
 
 options
 
 were vested. Thus the formula’s denominator is wrong. The denominator refers to the total number of days from the granting of the option until the
 
 option
 
 becomes fully vested. Because the option itself fully vests at the time of its grant, a literal application of this formula results in a denominator of one. With a denominator of one the ratio defining the community interest exceeds 100 percent—a non sequitur in the context of community property. As we explain, however, this error does not require reversal. Reasonably interpreted, the court’s reference to vesting in the formula was not to the option date but to the date on which the restrictions on the
 
 stock
 
 issued pursuant to the option were removed. The court’s use of “vested” as applied to the stock was proper. Consistent with the court’s intent, the denominator of the formula should be modified to delete “option” and insert “stock received pursuant to the exercise of the option.” The question remains whether the modified formula is correct, and if so, whether it was correctly applied.
 

 C
 

 There were innumerable difficulties faced by the trial court in attempting to value Katherine’s community interest in the Loral stock. Inexplicably Katherine presented no evidence on the value of the option itself.
 
 [2]
 

 Katherine’s overriding concern at trial was the value of Loral stock under Eugene’s control. She stressed that since Eugene controlled the options she could lose value in the stock by his electing to forego what she thought would be valuable opportunities. (See
 
 In re Marriage of Gillmore
 
 (1981) 29 Cal.3d 418 [174 Cal.Rptr. 493, 629 P.2d 1].) In addition, the court’s efforts at achieving an equitable valuation and division of the stock were guided only by general principles; there were no appellate cases dealing with stock options.
 
 In re Marriage of Hug
 
 (1984) 154 Cal.App.3d 780 [201 Cal.Rptr. 676] now provides a lengthy discussion on the factors that should control in determining community interest in qualified stock options. (See also
 
 In
 
 
 *1216
 

 re Marriage of Nelson
 
 (1986)
 
 177
 
 Cal.App.3d 150 [222 Cal.Rptr. 790].) The general principles considered by the court included the following.
 

 “. . . [E]ach spouse’s time, skill, and labor are community assets, and whatever each spouse earns from them during marriage is community property.”
 
 (In re Marriage of Shea
 
 (1980) 111 Cal.App.3d 713, 717 [169 Cal.Rptr. 490].) After separation earnings and accumulations of a spouse are separate property. (Civ. Code, § 5118.) Fringe benefits are not a gift from the employer but are earned by the employee as part of the compensation for services.
 
 (In re Marriage of Fithian
 
 (1974) 10 Cal.3d 592, 596 [111 Cal.Rptr. 369, 517 P.2d 449], disapproved on other grounds in
 
 In re Marriage of Brown, supra,
 
 15 Cal.3d at p. 851.) Thus fringe benefits such as employee retirement, employer-paid life insurance and employee stock options are community property to the extent they are earned by the time, skill and effort of a spouse during marriage.
 
 (Id.,
 
 at p. 842;
 
 In re Marriage of Hug, supra,
 
 154 Cal.App.3d at p. 791;
 
 Patillo
 
 v.
 
 Norris
 
 (1976) 65 Cal.App.3d 209, 217 [135 Cal.Rptr. 210].) Fringe benefits consisting of contractual rights to future benefits after separation, though unvested and unmatured, are property subject to allocation between community and separate interests at the time of dissolution.
 
 (In re Marriage of Brown, supra,
 
 15 Cal.3d at pp. 844, 846.) While the “time rule” is the method most frequently used in allocating benefits earned in part during marriage
 
 (In re Marriage of Judd
 
 (1977) 68 Cal.App.3d 515, 522 [137 Cal.Rptr. 318]) the time rule is appropriate only where the amount of benefits is substantially related to the number of years of employment.
 
 (In re Marriage of Poppe
 
 (1979) 97 Cal.App.3d 1, 8-9 [158 Cal.Rptr. 500].) With respect to benefits payable after separation, the employee spouse may not by unilateral election transmute community property into separate property in an effort to deprive the spouse of an interest in retirement benefits without compensating that spouse for the interest lost as a result of the election.
 
 (In re Marriage of Gillmore, supra, 29
 
 Cal.3d at pp. 423-424, 426;
 
 In re Marriage of Stenquist
 
 (1978) 21 Cal.3d 779, 782 [148 Cal.Rptr. 9, 582 P.2d 96].)
 

 In re Marriage of Hug, supra,
 
 154 Cal.App.3d 780, applies these general principles in devising a formula to allocate community and separate property interests in stock options granted during marriage and exercisable after separation.
 
 Hug
 
 explains there may be a number of factors which prompt companies to offer stock options including but not limited to attracting and retaining qualified personnel in addition to compensating employees for both past and future services.
 
 (Id.,
 
 at pp. 785-787.) The characterization of a stock option as compensation for past or future services or both turns on the circumstances involved in the granting of that particular option.
 
 (Id.,
 
 
 *1217
 
 at p. 786.) “[N]o single rule or formula is applicable to every dissolution case involving employee stock options. . . . [T]he trial court should exercise its discretion to fashion an equitable allocation of separate and community interests in employee stock options exercisable by the employee spouse after the date of separation of the parties.”
 
 (Id.,
 
 at pp. 792-793.) However, the “time rule” may not be the appropriate method of valuation where a stock option is publicly traded or otherwise capable of valuation.
 
 (Id.,
 
 at p. 794.) Katherine points out that unlike
 
 Hug
 
 the court here calculated both the numerator and denominator from the date the Loral stock options were issued to Eugene, not from the commencement of his employment. We appreciate the effect this difference will have on the community property percentage in the options. But the fact that there is a difference does not necessarily mean the court erred. Here, the court was satisfied that the option represented “golden handcuffs” to assure Eugene would stay with Loral. That finding is unchallenged. (See, e.g.,
 
 In re Marriage of Nelson, supra,
 
 at p. 155, fn. 4.)
 

 Admittedly, the record is sparse on the issue of Loral’s specific reasons for granting the options. There was no evidence to indicate the stock options were a factor in initially attracting Eugene to Loral or that they were granted as deferred compensation for past services. Based on this record, the stock options reflected Eugene’s time, skill and effort beginning on the date the options were granted. That date may have reflected a change in Loral’s personnel policy without regard to past performance of its key employees. It may also have reflected Loral’s management decision to use the stock options to attract new employees in the future. Nonetheless there is a logical basis for use of the date the options were granted. We therefore defer to the trial court’s broad discretion.
 
 (In re Marriage of Poppe, supra,
 
 97 Cal.App.3d at p. 11.)
 

 D
 

 Katherine’s last quarrel with the treatment of Loral stock is that the court erred in using an effective rate of 61 percent to determine the federal and state income tax impact on the net gain apportioned between the parties. The court’s finding on this issue is supported by the evidence presented at the April 22, 1983, hearing.
 

 Pursuant to Internal Revenue Code section 83(a),
 
 [3]
 
 stock transferred, in connection with the performance of services is included in gross income “at the first time the rights of the person having the beneficial interest in
 
 *1218
 
 such property are transferable or are
 
 not subject to a substantial risk of
 
 forfeiture. ” (§ 83(a)(1), italics supplied.) The amount included in gross income is the fair market value of such property at the time it was transferable or not subject to a substantial risk of forfeiture over the amount paid for such property. (§ 83(a)(1), (2).) A “substantial risk of forfeiture” exists when the right in the property transferred is conditioned, directly or indirectly, upon the future performance of substantial services and the possibility of forfeiture exists if such condition is not satisfied. (§ 83(c)(1); 26 C.F.R. § 1.83-3(c).) Pursuant to these provisions of Internal Revenue Code, Eugene incurred a tax liability on the date each restriction was removed on stock issued pursuant to option Nos. 2, 3, and 4. White’s exhibit identified each of these dates, the market value on each date and Eugene’s tax liability. Using the formula the court determined the net gain and awarded Katherine cash equal to her proportional interest in that sum. Based on this record the court properly determined Eugene’s tax liability. Moreover White’s testimony on the tax treatment of restricted stock was consistent with the court’s earlier findings that the stock should be valued on the date the restrictions were removed, i.e., the date on which the stock irrevocably vested in Eugene.
 

 E
 

 Katherine also belatedly argues that the court erred in awarding her cash rather than a proportional interest in the stock itself. We say “belatedly” because Katherine ignores her specific request at trial for cash “forthwith.” Because the court honored her request, she is precluded from obtaining her proportionate interest in the stock.
 
 (Turner
 
 v.
 
 Markham
 
 (1907) 152 Cal. 246, 247 [92 P. 485];
 
 Wilson
 
 v.
 
 Wilson
 
 (1958) 159 Cal.App.2d 330, 334 [323 P.2d 1017].) We also reject Katherine’s claim the court erred in failing to reconsider its characterization and valuation of the stock options.
 
 [4]
 

 
 *1219
 
 n
 

 Epstein Credits
 

 Katherine correctly contends the court erred in granting Eugene
 
 Epstein
 
 credits
 
 (In re Marriage of Epstein
 
 (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165]) for repaying the balance of a bank loan, $21,800, borrowed before separation to purchase Loral stock under Option Nos. 2 and 3. Because the court determined a time formula was the proper way to apportion the community interest in the stock received pursuant to these options that same percentage should have been used to determine the
 
 Epstein
 
 credit. According to our calculations since 55 percent of the stock represents the community interest only $11,990 should have been allowed Eugene as a credit. Accordingly the judgment should be modified to award Katherine an additional $9,810.
 
 [5]
 

 HI
 

 Spousal Support
 

 Katherine raises several arguments with reference to the court’s treatment of spousal support. She asserts the court abused its discretion in “repeatedly refusing] to rule on the spousal support issue,” ultimately terminating jurisdiction, and providing for stepdown spousal support. We first discuss Katherine’s contention the court “repeatedly refused to rule on the spousal support issue.”
 

 Following the order to show cause hearing on October 26, 1979, the court ordered Eugene to pay spousal support of $800 monthly, the trust deed payment on the family residence ($168.35), real property insurance, maintenance including gardener and pool service, and all utility bills. The court also ordered Eugene to pay Katherine’s medical and dental bills including prescriptions. Katherine’s financial declaration showed monthly expenses of $1,593. The court’s order awarded her approximately $1,150 monthly.
 
 <
 

 The interlocutory judgment of dissolution continued the $800 monthly support order plus the house payment and medical insurance from February 19, 1981, to August 19, 1981. Spousal support was then reduced to $400 monthly, the house payment and medical insurance. The $400 monthly
 
 *1220
 
 spousal support and house payment were to continue from February 19, 1982, until May 19, 1982, but after February 1981 Eugene was to pay Katherine’s medical insurance in excess of $50 monthly. After May 1982 the court ordered $5,000 as an advance of community property to be characterized at a later hearing for the purpose of assisting Katherine. At the April 22, 1983, hearing the court terminated jurisdiction to award further spousal support. Based on this record, there is simply no basis for Katherine’s claim the court repeatedly refused to award her support.
 

 Did the court correctly terminate jurisdiction over spousal support?
 

 A trial court has broad discretion in setting both the amount and duration of spousal support upon the dissolution of marriage.
 
 (In re Marriage of Morrison
 
 (1978) 20 Cal.3d 437, 454 [143 Cal.Rptr. 139, 573 P.2d 41].) The court’s discretion is abused only when it “exceeds the bounds of reason” in light of all of the circumstances.
 
 (In re Marriage of Andreen
 
 (1978) 76 Cal.App.3d 667, 671 [143 Cal.Rptr. 94].) A court must consider several factors in making a spousal support order (Civ. Code § 4801, subd. (a)) including the duration of the marriage and the ability of the supported spouse to engage in gainful employment.
 
 (In re Marriage of Vomacka
 
 (1984) 36 Cal.3d 459, 467-468 [204 Cal.Rptr. 568, 683 P.2d 248];
 
 In re Marriage of Neal
 
 (1979) 92 Cal.App.3d 834, 846 [155 Cal.Rptr. 157].)
 

 Here, spousal support which started October 26, 1979, continued in more or less the same amount for over 18 months at which time it continued on a reduced basis for an additional nine months. The court retained jurisdiction over spousal support until April 22, 1983, almost four years from the date of separation. In ruling on spousal support the court explained it was aware of Katherine’s epileptic condition, but found she was employable. The record supports the court’s findings. Katherine was 33 when the parties separated. She had worked before marriage. Medication was effective to stabilize her condition. Although Katherine had not sought work since separation due to her own concern about possible seizures and her nervousness about the divorce, she was licensed to drive, regularly cared for neighborhood children, attended Palomar College, and had made five trips to visit her family in New York. On this evidence we cannot say the court exceeded its discretion in terminating spousal support.
 

 We have more concern with the order reducing spousal support from $800 to $400 effective August 19, 1981, which continued for nine months through May 1982. Orders for changes in support effective in the future must be based upon reasonable inferences to be drawn from the evidence and not mere speculative expectations.
 
 (In re Marriage of Smith
 
 (1978) 79 Cal.App.3d 725, 740 [145 Cal.Rptr. 205].) During the period
 
 *1221
 
 spousal support obligation continues it must be based upon the realities of the situation, specifically the income and expenses of the respective parties. Here an award of $800 per month as spousal support was consistent with Katherine’s needs. There was no factual basis for the reduction of that amount to $400. The judgment is modified to require Eugene to pay Katherine $3,600 representing the difference between the spousal support orders for the nine months in question.
 
 [6]
 

 IV
 

 Attorney’s Fees
 

 Katherine claims the court abused its discretion in failing to award reasonable attorney’s fees, court costs and expert witness fees.
 

 At the order to show cause hearing the court ordered Katherine’s counsel to be paid $1,200 from a community property savings account. On February 19, 1981, the court ordered a $5,000 “credit ... in regard to the distribution of community property” as additional fees and refused to reimburse counsel for the New York attorney’s fee for the deposition. The interlocutory judgment ordered Eugene to pay Katherine’s counsel $2,000. On April 22, 1983, the court denied Katherine’s request for attorney’s fees and court costs.
 

 Civil Code section 4370 authorizes an award of attorney’s fees in a dissolution proceeding. The court must evaluate each party’s needs to insure that both parties will have their day in court.
 
 (In re Marriage of Popenhager
 
 (1979) 99 Cal.App.3d 514, 525 [160 Cal.Rptr. 379].) The fact that a spouse has separate property does not necessarily negate need since a spouse is not required to impair the capital of his or her separate estate in order to defray litigation costs.
 
 (In re Marriage of Stephenson
 
 (1984) 162 Cal.App.3d 1057, 1090 [209 Cal.Rptr. 383].) The same considerations apply to postdissolution proceedings. (Civ. Code, § 4370;
 
 In re Marriage of Sullivan
 
 (1984) 37 Cal.3d 762, 768 [209 Cal.Rptr. 354, 691 P.2d 1020].) Fees are awarded to provide one of the parties with an amount adequate to properly litigate the controversy where necessary.
 
 (Ibid.)
 

 Recognizing an award of attorney’s fees and costs in dissolution proceedings is left to the sound discretion of the trial court
 
 (In re Marriage of Lopez
 
 (1974) 38 Cal.App.3d 93, 113 [113 Cal.Rptr. 58]), we conclude here there is insufficient evidence to support the court’s order. Eugene’s
 
 *1222
 
 financial declaration submitted at the April 22, 1983, hearing showed gross monthly income in excess of $12,000. His September 1981 declaration showed gross monthly income of approximately $7,000. Katherine’s only income was her spousal support. Eugene had the ability to pay. Katherine had the need.
 

 Katherine’s counsel submitted itemized declarations showing 293.7 hours devoted to this case excluding the three days of trial in February 1981 and the full day of trial on April 22, 1983. Statements of itemized costs showed Katherine expended $4,270.04 to litigate the matter including the cost for the New York deposition. In light of the extensive time devoted, the difficulty and novelty of the issues, the need to depose the witness in New York and the accompanying costs for that deposition, a $2,000 award of attorney’s fees is inadequate. The judgment is reversed for a determination of a reasonable attorney’s fee to be awarded to Katherine’s counsel. We have considered and decline to order attorney’s fees for either party on this appeal.
 

 Disposition
 

 The judgment denying attorney’s fees is reversed. The judgment is modified to order John Eugene Harrison to pay Katherine S. Harrison $3,600 additional spousal support plus $9,810 reimbursement for incorrectly determined
 
 Epstein
 
 credits for a total of $13,410. In all other respects the judgment is affirmed. Each party shall bear his or her respective costs for this appeal.
 
 [7]
 

 Lewis, J., and Adams, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied May 14, 1986, and appellant’s petition for review by the Supreme Court was denied July 9, 1986.
 

 [1]
 

 “[Katherine’s] share is to be obtained by creating a fraction, the numerator of which will be the total number of days between the signing or granting of the option agreement and the date of separation, the denominator of which will be the total number of days from the signing or granting of the option agreement and the day on which each portion of the option became fully vested and not subject to divestment. The ratio created by such fraction will be divided into the gain on the stock option on the date of exercise to determine the community property interest therein after reimbursement for the purchase of the option and any taxes paid by [Eugene] thereon in connection with the exercise of the option. All remaining interest in any stock option agreement not a part of this said ratio is confirmed as the sole and separate property of [Eugene], [1] . . . [T]he basis for determining [Katherine’s] interest goes only to the gain on the stock option plan after the costs of the purchase of the stock option by [Eugene] and any taxes paid thereon are repaid to [Eugene]. ... [1] The Court Further Finds that since [Katherine] could not exercise any option rights, her tax position is not relevant to the basis and formulation of the gain attributable to each stock option. Accordingly, such formulas should be applied and calculated as to each option to determine the share of any profit therefrom in the community estate and thusly to [Katherine], If [Eugene] does not choose to or cannot sell shares obtained through his stock option rights, he shall be required to pay to [Katherine] that portion of the gain that would have occurred on the first date in which each portion of each option could have been exercised. The court relies on
 
 In re Gilmore
 
 [szc] (1981) 29 Cal.3d 418 as authority on this premise.”
 

 [2]
 

 Options to buy or sell listed stock, puts and calls, are regularly traded on listed exchanges. This record does not disclose why Katherine’s counsel failed to present evidence on the value of Eugene’s vested options. We suspect that there soon will be a case in which one spouse will focus on the value of the vested option and the other spouse will argue the value of the restricted stock issued pursuant to that option highlighting the element of post-separation efforts. Whether expert witnesses will testify that the option and stock have the identical value is a question which is not before us.
 

 [3]
 

 Unless otherwise specified, all statutory references are to the Internal Revenue Code, title 26 United States Code.
 

 [4]
 

 Although we could have based our decision on the following ground we have declined to do so preferring to reach the merits of Katherine’s contentions. In affirming the court’s treatment of the Loral Stock options we could merely have said that by accepting the benefits of the judgment Katherine waived her right to appeal on this issue.
 
 (Turner
 
 v.
 
 Markham
 
 (1907) 152 Cal. 246, 247 [92 P. 485];
 
 Wilson
 
 v.
 
 Wilson
 
 (1958) 159 Cal.App.2d 330, 334 [323 P.2d 1017]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeals, § 161, p. 171.) Using that reasoning her claim to a share of dividends and interest from the date dividends were paid would also have been barred. To support this conclusion we could point to the following.
 

 At the conclusion of the April 22, 1983, hearing Katherine’s counsel argued there was-“no reason to prolong [this case] any further.” Eugene could “sell [his] stock and get the money in five days. You can take the stock to any . . . stockbroker and put it in a margin account, get half the fair market value the same day.” In response to this argument the court set up a schedule for Eugene’s payment by installments of the amount due Katherine. Eugene paid the sum of $67,142 on May 22, 1983, which included the value of the stock, dividends
 
 *1219
 
 and interest from the date the forfeiture provisions lapsed, less end balance and credits against community property. He mailed his check to Katherine in a letter clearly identifying what the payment represented. Katherine did not reject the check nor indicate her acceptance was conditional.
 

 [5]
 

 We determined 55 percent as the community interest in the stock by dividing the total shares of stock available under these options, 10,800, by the number of shares determined to be community property in accordance with the formula, 5,939.
 

 [6]
 

 We reject Katherine’s contentions the court erred in characterizing Eugene’s $5,000 advance to Katherine as a division of the community property.
 

 [7]
 

 We reject Katherine’s claim the court erred when it failed to reimburse the community $34,664 for child and spousal support paid to Eugene’s first wife from the community checking account. Substantial evidence supports the court’s finding that separate and community bank accounts became commingled.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.