[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This contested dissolution of marriage action addresses a myriad of undecided marital financial issues in Connecticut. Counsel has informed the court that this decision may have an impact beyond the territorial boundaries of the State of Connecticut. At the commencement of trial, the parties presented a written stipulation to the court in which the parties agreed, that the marriage of the parties has broken down irretrievably, a dissolution of marriage ought to enter and no evidence would be offered as to the "causes for the dissolution of the marriage", a statutory factor contained in Connecticut General Statutes §§46b-81(c) and 46b-82.
That was the end of the parties agreement. Virtually every aspect of the parties' financial relationship over the 31 years of the marriage was examined. The trial took 18 days. Two interlocutory appeals were taken to the Appellate Court during the trial, one of which was subject to Supreme Court review. Over one hundred exhibits were offered, a number of which contained hundreds of pages. The briefs of counsel, citations of non-Connecticut cases and law review references added another 1,500 pages for the court's consideration. Multiple experts testified for each party. Faria v. Faria, 38 Conn. Sup. 37, 38
(1982).
Both counsel consider a number of matters set forth in theTable of Contents to be of first impression in Connecticut and request a resolution each of these issues. Sheff v. O'Neill,238 Conn. 1, 88 (Borden, J. dissenting) (1996) ("I can think of no other case decided by this court that will have more impact on the daily lives of our citizenry than this case.")[1]
The parties early on in the case submitted their thumbnail view of main issue. CT Page 13655
The plaintiff: "Marriage is a partnership, and I should be entitled to 50%. I gave thirty-one years of my life. I loved the defendant. I worked hard and I was very loyal."
The defendant: "When all the media hype, feminist theory and rhetoric are put aside, this case is relatively simple and straight forward. It involves a long marriage and a large estate, the distribution of which is governed by a Connecticut statute that has been on the books for almost twenty-five (25) years."
ORDERS
The evidence having been presented indicates that the marriage has broken down irretrievably, and, therefore, judgment may enter dissolving the marriage on those grounds.
The court has carefully considered the following in reaching the decision reflected in the orders that follow: Connecticut General Statutes §§ 46b-62, 46b-81 and 46b-82, O'Neill v.O'Neill, the testimony of the witnesses, the exhibits filed, claims of law, relevant case law and Scherr v. Scherr,183 Conn. 366, 368 (1981).
The following orders may enter:
1. The defendant will transfer to the plaintiff all his right, title and interest in and to the marital residence at 328 Erskine Road, Stamford, Connecticut and the adjoining lots, described on his financial affidavit as Lot #3 and Lot #6, free and clear of all encumbrances, mortgages and liens. The plaintiff is to have the exclusive possession thereof effective on the date of the decree. The existing $1,000,000 first mortgage will be paid off by the defendant within 30 days from the date of this decision. Written proof of said payment made by the defendant to the first mortgagee along with a release of the first mortgage in recordable form will be furnished to the plaintiff immediately. Real estate taxes for the period ending December 31, 1997 and homeowner's insurance and utilities, if not yet paid by the parties, will be paid through and including December 31, 1997 by the defendant, and he shall provide proof of payment to the plaintiff. Thereafter, the plaintiff will pay for all expenses whatsoever regarding the real property and hold the defendant harmless therefrom.
2. The defendant will transfer to the plaintiff all his CT Page 13656 right, title and interest in and to the real property located at 48 Spadefish Lane, Key Largo, Florida. Thereafter, the plaintiff will pay for all expenses whatsoever regarding the real property and hold the defendant harmless therefrom. All rents and security deposits, if any, shall be assigned and paid to the plaintiff thereafter.
3. The defendant shall pay to the wife as periodic alimony the sum of $252,000 per year payable in equal monthly installments of $21,000.00 on the first day of each month. Said periodic alimony is to terminate upon the occurrence of the first of the following events: the death of the plaintiff, the plaintiff's remarriage or a court finding under C.G.S. §46b-86 (b) as amended. The alimony is otherwise nonmodifiable as to amount, term and conditions. The first payment shall be due on the date of this decision prorated to the first day of following calendar month.
4. The defendant shall retain as his own property, free and clear of any claim by the plaintiff, the following real property whether held in his name or jointly (Defendant's financial affidavit dated November 24, 1996): 1) Two lots in Homosassa, Florida (Aie), 2) Land and buildings at 39 Wilshire Road, Greenwich, Connecticut (Aiib), 3. Unit 2G, Soundview Towers, Stamford, CT (Aif) and 4) Mortgage note and deed at Unit 11 J, Hayes House, Stamford, Connecticut (Aig).
5. The parties shall divide equally all of the currently available cash, stocks, bonds and mutual fund assets of the parties regardless of the registered title valued as of the date of this decision, including, but not limited, to the following:
1. Fleet Bank Galaxy (plaintiff)
2. Fleet Bank checking (joint)
3. Fleet Bank checking (plaintiff)
4. Fleet Bank MMA (plaintiff)
5. Fleet Bank Savings (joint)
6. Paine Webber Tax Exempt MMA (joint)
7. General Electric Elfun MMA (joint) CT Page 13657
8. Paine Webber portfolio (joint)
9. Elfun Global Fund (joint)
10. Elfun Tax Exempt Fund (joint)
11. Fleet Brokerage portfolio (joint)
12. Elfun Tax Exempt Fund (joint)
 13. General Electric Savings Security Program Mutual Fund (joint)
14. Paine Webber portfolio (defendant)
15. General Electric Interest plus (defendant)
16. U.S. Series E Bonds (defendant)
17. Elfun Trusts (joint)
18. Elfun Tax Exempt Fund #1 (defendant)
19. Elfun Tax Exempt Fund #2 (defendant)
In addition to those specific assets the following amounts will be added back in for this equal division purposes: a) The funds used to purchase the real property at 39 Wilshire Road, Greenwich, Connecticut not including the $180,000 down payment, b) Attorney fees, expert fees and costs of litigation paid by each party on and after January 1, 1997 and c) any expenditure not in the usual course of business or for customary and usual household expenses from said cash, stocks, bonds and mutual fund assets of the parties including transfers to other investment vehicles. Once these sums are added back, the total will be divided equally between the parties with each party to be given distribution credit for the amounts set forth in section a), b) and c) of this paragraph. The court will retain continuing jurisdiction over the valuation, existence and/or division of said assets. C.G.S. § 46b-4.
6. The plaintiff is awarded, as her own separate property free and clear of all claims by the defendant, all fixtures, furniture, furnishings, decorations, bric-a-brac and items of CT Page 13658 tangible personal property located at 328 Erskine Road, Stamford, Connecticut and 48 Spadefish Lane, Key Largo, Florida. The defendant shall receive from the 328 Erskine Road house, his personal and business papers as well as his golf clubs and related golf equipment.
7. The defendant is awarded, as his own separate property free and clear of all claims by the plaintiff, all fixtures, furniture, furnishings, decorations, bric-a-brac and items of tangible personal property located at 39 Wilshire Road, Greenwich, Connecticut.
8. There are two items of personality that are not subject to orders #6 and #7. a) A painting entitled "Maria Callas" by Daniel Authquart located in the foyer of 328 Erskine Road and b) a Turkish carpet hanging in the family room at 328 Erskine Road. Neither party offered testimony as to those items, but both did submit post trial affidavits in support of their respective claims. The court enters the following orders as to the two items of personal property: One party, chosen by lot, will select one item and that item shall become their own personal property, free and clear of any claim by the nonselecting party. The item not selected shall become the property of the nonselecting party, free and clear of any claim of the selecting party. The fair market value of the two items will be equalized and offset by a cash payment. The market value shall be determined by an appraiser selected by mutual agreement of the parties. If no one appraisal can be agreed upon, each party shall select one appraiser, and the two appraisers will select a third appraiser. The median appraisal will be the market value. All appraisals, whether sole appraisal or median appraisal, will be binding. The cost of all appraisals shall be paid by the parties equally. The above orders will remain the orders of this court, notwithstanding the fact that the court did not hear testimony concerning the two items of personal property. In the event neither party files a written motion within 20 days from the date of this decision (which date shall not be extended under any circumstances) to hear additional evidence pursuant to C.G.S. § 46b-4 and Ross v. Ross, 172 Conn. 269, 273 (1977), the above orders will be the final orders of this court.
9. The plaintiff shall be awarded all the right, title and interest in and to the membership and privileges of the Ocean Reef Club, Key Largo, Florida and the Stanwich Club, Greenwich, Connecticut. In the event the bylaws and rules and regulations of CT Page 13659 the Stanwich Club so permit and do not conflict with the award to the plaintiff of the Stanwich Club membership, the court grants permission for the defendant to retain and/or apply for membership in the Stanwich Club. The plaintiff shall support and endorse all such application efforts by the defendant. The defendant shall pay all dues, fees and assessments of the Stanwich Club membership up to and including December 3, 1997. The plaintiff shall pay all unpaid personal charges incurred by her and her guests at any time and all dues, fees and assessments of the Stanwich Club membership after December 3, 1997. If an initiation, application and/or bond fee is to be paid to the Stanwich Club, each party is to pay their own fees.
The above orders will remain the orders of this court, notwithstanding the fact that the court did not hear testimony concerning the Stanwich Club. In the event neither party files a written motion within 20 days from the date of this decision (which date shall not be extended under any circumstances) to hear additional evidence pursuant to C.G.S. § 46b-4 and Rossv. Ross, 172 Conn. 269, 273 (1977), the above orders will be the final orders of this court.
10. The defendant shall be awarded all the right, title and interest in and to the membership and privileges of the Nantucket Golf Club.
11. Each party shall pay their own counsel fees, expert fees, witness fees and costs of litigation.
12. Any hold harmless order contained in these orders shall include the right by the other party to collect attorney fees incurred in defending the claim and/or in prosecuting any efforts to enforce said hold harmless agreement.
13. The defendant shall pay for and hold the plaintiff harmless from any and all claims, liabilities, obligations, demands, deficiencies, assessments, penalties and interest arising out of any joint federal or state income tax returns filed by the parties. The defendant will provide to the plaintiff all documents and information, in form and content satisfactory to the plaintiff's tax advisor, necessary for the plaintiff to file tax returns in the future. All prior joint tax returns and the documents and information supporting said returns shall be shared by the parties upon written demand. All refunds and credits shall become the defendant's sole and exclusive property. CT Page 13660
14. Although not an asset of the parties, both parties are co-trustees of the Wendt Family Foundation. Exhibit 88. As of December 31, 1995 the assets of the Foundation were $832,733. Exhibit 63, Tab 11, Page 40. The assets of the Foundation will be divided in half. A separate new Foundation will be created with each half to be used for the same uses and purposes as the existing Wendt Family Foundation. Each new Foundation will be separate and apart from the other. Each party will tender their written resignation as trustee of the existing Wendt Family Foundation. Each party will select the trustee or trustees of one new Foundation only. The costs incurred by both parties in establishing or dividing said existing Wendt Family Foundation and/or creating these new Foundations shall be shared equally by the parties themselves, not the Foundation or successor Foundations. If this division, resignation and/or selection process causes adverse tax consequences, impacts the tax free status, or affects the corporate viability of the existing Wendt Family Foundation or the new Foundations, this court will retain continuing jurisdiction to fashion some other order in regard to the division and management of the Wendt Family Foundation. That future order may include but not be limited to the appointment of three trustees of the existing Wendt Family Foundation, the plaintiff and defendant each chosing one co-trustee and a third co-trustee chosen by the two named co-trustees. The vote of two co-trustees would be necessary to make any decision in the existing Wendt Family Foundation.
15. The parties currently hold assets in revocable trusts for the two children. They are not listed in the parties' financial affidavits or the parties' financial statements. The parties agree that these assets belong to the respective children. The parties are ordered to relinquish their trusteeship and to either appoint a new trustee or convey the assets to the children directly. The assets of the various revocable trusts as of December 31, 1996 are shown in Exhibit 127.
16. The General Electric Qualified Pension Plan, currently vested, will be divided by the parties equally. The plaintiff's fifty percent interest in the General Electric Qualified Pension Plan will be secured by a Qualified Domestic Relations Order.
Until the QDRO is issued in compliance with this order, the defendant is ordered to retain the plaintiff as the surviving spouse on the GE Qualified Pension Plan for all death benefits CT Page 13661 accrued/earned during the marriage, and eligible for any payments afforded a surviving spouse per the terms of said plan. The Plaintiff shall have the right to all notices and information given to the participant with respect to the plan, including, but not limited to the annual benefit statement, plan documents and related summary plan descriptions. The defendant shall not remove any prior employee plan contributions or take out any loans from any plans without the prior written consent of the plaintiff.
All QDROs in regard to this pension plan shall be executed within sixty (60) days as of the date of this decree. Exhibit 106, p. 4.
Defendant is to furnish written authorization to appropriate General Electric Corporation (GE) Personnel and Human Resources Departments for the release of any and all pertinent pension and related data on an annual basis to the Plaintiff and her designated advisors in order to review the status and accuracy of potential benefits to be paid to the plaintiff. Said authorization shall request that GE release said information in writing within 30 days of the request. Exhibit 106, page 3.
17. The defendant is awarded all the right, title and interest in and to the General Electric Supplementary Pension Plan (nonqualified plan) including whatever "retirement allowance" payment that may be paid to the defendant by General Electric Corporation. Said Supplementary Pension Plan is payable to a GE executive who has worked for five years immediately prior to his retirement or 60th birthday, whichever first occurs. No vesting accrues or service credit accrue for any employment by GE prior to that five year period. The defendant's date of birth is March 13, 1942. Exhibit 63, Tab 4, page 8. As of the last day of trial in February, 1997 the defendant was 54. He has an projected retirement age of 65. Therefore, all GE employment services to be rendered by the defendant in order to become eligible for said GE Supplementary Pension Plan would be post-separation. At five years after the December 1, 1995 separation, the defendant will be 58.
In the event the defendant retires, dies or otherwise is entitled to receive any benefits or payment from the General Electric Supplementary Pension Plan prior to December 1, 2000 including whatever "retirement allowance" payment on said Supplementary Pension Plan the defendant may be entitled to or any death benefits, the plaintiff is awarded one-half of a CT Page 13662 "coverture factor" of that payment received by the defendant or any death benefits if the defendant dies prior to December 1, 2000. The coverture factor will be determined by a fraction; the denominator of which shall be 60 months, and the numerator shall be the number of months from the date of first payment to December 1, 2000 (five years from the December 1, 1995 separation). For example, if the defendant went into pay status on December 1, 1998 on his Supplementary Pension Plan augmented by a GE "retirement allowance" receiving $50,000 per month, the numerator would be 24 months from December 1, 1998 to December 1, 2000 over the denominator of 60 months. The fraction would be 24/60th or 40%, and the plaintiff would be entitled to receive one-half of that 40% of the $50,000 monthly benefit, i.e. $10,000 per month paid to the plaintiff each month effective December 1, 1998.
In the event said GE Supplementary Pension Plan is not subject to a QDRO or Domestic Relations Order (DRO), the plaintiff's portion of said plan, as ordered, shall be paid directly to her by GE. In the event said payment cannot made directly to her by GE, the defendant and/or his estate shall make said payments directly to the plaintiff in the amount, dates and manner that the plaintiff would have received it made directly by GE. This is a property distribution order, and said payments are neither periodic alimony nor payments in the nature of periodic alimony.
18. The defendant holds 199,000 shares of restricted stock in General Electric Corporation that were granted to him at various dates. The restrictions will not start to lapse until June, 1998. Exhibit 70, note 13. The 199,000 shares of restricted stock pay a "dividend equivalent" equal to the current dividend paid by GE on its common stock. Exhibit 63, Tab 14, Page 2 discloses these dividend equivalents to be $396,000/year. The plaintiff is awarded one-half of the "divided equivalent" and/or dividends on the entire 199,000 shares of GE restricted stock to be paid if and when received by the defendant. The defendant is awarded the remaining one-half of the "dividend equivalent" and/or dividends as well as the 199,000 shares of GE restricted stock. This obligation of the defendant and/or his estate will end on the wife's death. This payment cannot otherwise be modified, terminated or suspended.
19. The plaintiff is awarded one-half of 17/30th (i.e. 17/60th to plaintiff, 43/60th to defendant) of the $6,650,000 CT Page 13663 deferred portion of the defendant's General Electric Long Term Performance Award ("special bonus") to be paid out by GE, upon the defendant's retirement, over a twenty year period. Exhibit 70, note 14; Exhibit 63, Tab 11, Page 11 and Page 14; Exhibit 73. The plaintiff shall receive said payments "if, as and when" said payments are made to the defendant and/or the defendant's estate. The defendant shall not deduct the medicare tax he has paid, and each party will pay for and hold the other party harmless from all other taxes that may be due on their share. This is an award of property and not periodic alimony, and, thus, is not subject to divestment or modification. It is binding on the defendant and his estate. The 17/30th represents the number of months from the inception of the plan, July 1, 1994, to the completion of the plan, December 31, 1996, divided by the number of months from the inception of the plan to the parties' December 1, 1995 separation. Said payment shall be made to the plaintiff together with all interest, dividends, dividend equivalents, accumulated dividends, stock, stock splits, earnings and increases in the valuation from January 1, 1997, the effective date of the twenty year election made by the defendant. If necessary, said transfer shall be secured by a QDRO or DRO.
20. The defendant shall be awarded all the right, title and interest in the General Electric Savings and Security Program (401K plan), free and clear of any claim by the plaintiff. Exhibit 70, note 8.
21. The defendant shall be awarded all the right, title and interest in the General Electric Deferred Incentive Compensation Plan, free and clear of any claim by the plaintiff. Exhibit 70, note 9.
22. The defendant shall be awarded all the right, title and interest in the General Electric Executive Deferred Salary Plan, free and clear of any claim by the plaintiff. Exhibit 70, note 10.
23. The defendant shall pay to the plaintiff the sum of $2,000,000 as property distribution to be paid by January 6, 1998.
24. According to the December 31, 1996 unaudited financial statement prepared by KPMG Peat Marwick, LLP, Exhibit 70, the defendant owns 175,000 shares of General Electric Vested Stock Options and Appreciation Rights in the following amounts: 100,000 CT Page 13664 units granted 11/20/92 with a $40.00 per share exercise price, 70,000 units granted 9/10/93 with an exercise price of $48.3125 and 5,000 units granted 6/24/94 with an exercise price of $46.25. Exhibit 70, note 11. That unaudited financial statement used the "intrinsic value" method, with a December 31, 1996 NYSE price of GE common stock at $98 7/8 per share. On May 12, 1997 GE common stock split 2 for 1 and, thus, the number of options have doubled to conform to this stock split. As of the date of separation, December 1, 1995, GE was trading at $72.00 per share. As of October 7, 1997 GE was trading at $72.00 per share in its split status or $144.00 per share at the pre May 12, 1997 stock split number of stock options. Based on the facts found, this court will divide the 175,000 vested stock options and appreciation rights based as of the date of separation, December 1, 1995. The "intrinsic value" of the 175,000 stock options as of December 1, 1995 was $3,200,000 for the 11/20/92 grant, $1,658,125 for the 9/10/93 grant and $128,750 for the 6/24/94 for a total "intrinsic value" of $4,986,875.
This amount is before taxes. The vested stock options have no cash value until exercised and when exercised the tax is due at short term capital gains tax rates, i.e. ordinary income tax rates. Assuming current maximum rates for the IRS, Medicare and Connecticut that net after tax of $4,986,875 "intrinsic value" would be $2,804,219. One half of said sum ought to be distributed to the plaintiff. The defendant shall pay that sum in cash and not in any portion of the options. The doubling of GE stock since the date of separation is not due to the plaintiff's efforts, but she should share in the general increase in the investment community.
Therefore, the defendant shall pay to the plaintiff the sum of $1,700,000 as property. The defendant is awarded all the right, title and interest in the 175,000 General Electric Vested Stock Options and Appreciation Rights, free and clear of all claims by the plaintiff.
25. The defendant holds 420,000 stock options and appreciation rights in General Electric common stock which were unvested as of the last date of trial in February, 1997. Exhibit 70, note 12. Although one portion of a grant vested on September 16, 1997, after trial and prior to the date of this decision, this court will treat all 420,000 stock options as unvested. This court has already concluded that a portion of these unvested stock options is marital property. The court has also concluded CT Page 13665 that the unvested stock options were granted for future services so a coverture factor must be established. Based on the facts found, the level of the contribution made by the plaintiff as corporate wife and the lack of such evidence of those contributions after the date of separation, December 1, 1995, the court will use a "coverture factor". The coverture factor will be determined by a fraction, the denominator of which shall be the number of months from the date of grant to the date of vesting and are not subject to divestment, and the numerator will be the number of months from the date of grant to December 1, 1995. This fraction will be multiplied by the number of shares to be vested at that date of vesting. The price of GE common stock on the date of separation will be used, i.e. $72.00 per share to calculate an "intrinsic value". The unaudited financial statement as of December 31, 1996, established the date of grant, date of vesting, the exercise price and number of options vesting as of the date of vesting. Exhibit 70, Note 12. In re Marriage ofNelson, 177 Cal.App.3d 150, 155, 222 Cal.Rptr. 790, 793
(Cal.App. 1 Dist. 1986); In re Marriage of Harrison, 179 Cal.App.3d 1216,225 Cal.Rptr. 234, 237 fn. 1 (Cal.App. 4 Dist. 1986); Inre Marriage of Miller, 915 P.2d 1314, 1319 (Colo. 1996); DeJesusv. DeJesus, 97 N.Y. Int. 0184, New York Court of Appeals, slip opinion 2 No. 161 October 30, 1997, 1997 WL 677284 (N.Y. Oct. 30, 1997); Majauskas v. Majauskas, 61 N.Y.2d 481, 474 N.Y.S.2d 699,463 N.E.2d 15, 22 (N.Y. 1984).
There are eight separate dates of vesting so eight separate coverture factors have to be calculated.
1. 70,000 units granted 9/10/93 vesting 9/10/98
 date of grant 9/10/93 to 12/1/95 = 27.7 = 44.5% date of grant 9/10/93 to 9/10/98 60
70,000 x 44.5% = 31,150 units to be divided.
 $72-$48.3125 exercise price = $23.6875 intrinsic value per share x 31,150 units = $737,866
2. 5,000 units granted 6/24/94 vesting on 9/24/98
 6/24/94 to 12/1/95 = 17.233 = 44.19% 6/24/94 to 9/24/98 39
5,000 x 44.19% = 2210 units to be divided.
$72-$46.25 exercise price = $25.75 x 2210 units = $56,908 CT Page 13666
3. 57,500 units granted 9/16/94 vesting 9/16/97
 9/16/94 to 12/1/95 = 14.5 = 40.277% 9/16/94 to 9/16/97 36
57,500 x 40.28% = 23,161 units to be divided.
$72-$51.00 exercise price = $21.00 x 23,161 = $486,381
4. 57,500 units 9/16/94 vesting 9/16/99
 9/16/94 to 12/1/95 = 14.5 = 24.166% 9/16/94 to 9/16/99 60
57,500 x 24.17% = 13,898 units to be divided.
$72-$51.00 exercise price = $21.00 x 13,898 units = $291,858
5. 57,500 units granted 9/15/95 vesting 9/15/98
 9/15/95 to 12/1/95 = 2.566 = 7.12% 9/15/95 to 9/15/98 36
57,500 x 7.12% = 4094 units to be divided.
$72-$63.8750 exercise price = $8.125 x 4094 = $33,264
6. 57,500 units granted 9/15/95 vesting 9/15/2000
 9/15/95 to 12/1/95 = 2.566 = 4.28% 9/15/95 to 9/15/00 60
57,500 x 4.28% = 2461 units to be divided.
$72-$63.8750 exercise price = $8.125 x 2461 = $19,996
7. 57,500 units granted 9/13/96 vesting 9/13/99
 9/13/96 to 12/1/95 = 0 = 0% 9/13/96 to 9/13/99 36
57,500 x 0% = 0 units to be divided.
$72-$88.375 exercise price = 0
8. 57,500 units granted 9/13/96 vesting 9/13/2001
 9/13/96 to 12/1/95 = 0 = 0% 9/13/96 to 9/13/01 = 60 CT Page 13667
57,500 x 0% = 0 units to be divided.
$72-$88.375 exercise price = 0
Total "intrinsic values" after application of coverture factor
 1) $737,866 2) $ 56,908 3) $486,381 4) $291,858 5) $ 33,264 6) $ 19,996 7) 0 8) 0
$1,626,273
These unvested stock options have certain risks attached to them: 1) The defendant will not be employed by GE as of the date of vesting and thus the options will have no value, 2) The defendant will not be employed by GE as of the date of vesting and he has not been offered a "separation package" by GE which includes vesting of some portion of the options and thus the options will have no value, 3) Scenario # 2 occurs, the defendant is offered vesting only in GE stock in which the coverture factor is zero, 4) Scenario #2 occurs, GE offers no "separation package" and the defendant is offered a substantial signing bonus by his new employer in effect rendered the GE options valueless yet the defendant still would receive substantial equivalent value from his new employer, 5) GE amends, suspends, alters, modifies or terminates the stock option plan either individually or company wide and 6) GE common stock falls to a level below the pre-May 12, 1997 stock split price of $72.00/share. Although the plaintiff in her claims for relief wished to accept these risks, this court feels otherwise. "Long term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible."Krafick v. Krafick, supra 802. The defendant is better able to bear "the entire risk of forfeiture before maturity". Krafick v.Krafick, supra 802. There are sufficient "other assets by which to offset the value" of the unvested stock options. Krafick v.Krafick, supra 802.
The court is not satisfied that any of the methods of evaluating unvested stock options testified to by the plaintiff's CT Page 13668 expert are appropriate. The court therefore cannot place an exact value on the unvested stock options either at the date of separation or at any other time. It can use the "intrinsic value" to obtain an approximate value. Using the "intrinsic value" method for all 420,000 shares of GE unvested stock options, the plaintiff's expert arrived at a figure using the then GE common stock price of $102.75 per share. Exhibit 99; exb G. The same expert using the Black-Scholes model obtained a value ten percent lower than the above "intrinsic value". Exhibit 99, page 18. Therefore, the "intrinsic value" method produced a higher result; a benefit to the plaintiff if the "intrinsic value" method is used. Therefore, this court feels that the use of the "intrinsic value" method is appropriate under the facts and circumstances of this case.
The $1,626,273 is the "intrinsic value" of the 420,000 GE unvested stock options which are to be divided between the parties after application of the coverture factor. It used the date of separation value of $72.00/share. This amount is before taxes. Assuming current maximum rates for the IRS, Medicare and Connecticut that net after tax of $1,626,273, "intrinsic value" would be $914,486. One half of said sum ought to be distributed to the plaintiff. The plaintiff shall pay that sum in cash and not in any portion of the options. The doubling of GE stock since the date of separation is not due to the plaintiff's efforts, but she should share in the general increase in the investment community.
Therefore, the defendant shall pay to the plaintiff the sum of $1,107,000 as property. The defendant is awarded all the right, title and interest in the 420,000 General Electric Unvested Stock Options and Appreciation Rights, free and clear of all claims by the plaintiff.
26. The defendant shall retain all voting and property rights, if any, in any vested stock options, unvested stock options or restricted stock units. The defendant shall not pledge, assign, lien, encumbered or otherwise transfer said options and units until the defendant has complied in full with the orders set forth as to each resource. Once the orders as to said resource are complied with, the remainder of the resource will be owned by the defendant free and clear of any court restrictions or claims and demands made by the plaintiff.
27. The defendant shall be entitled to retain the $20,888 CT Page 13669 cash surrender value of the GE supplemental life insurance its death benefit of $196,507 as well as all ownership rights, including the right to designate the beneficiary. Exhibit 70, Note 15.
28. The plaintiff shall have all rights permitted to her under any state or federal law for converting existing health insurance from a group plan to her separate coverage including, but not limited to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) and the Health Insurance Portability and Accountability Act of 1996 (HIPAA). The defendant shall cooperate and sign all documents necessary to allow the plaintiff to obtain such health insurance coverage for herself. The plaintiff shall pay all costs and premiums for the maintenance of said health insurance coverage.
29. The plaintiff shall be entitled to retain and use, separate and apart from the defendant, the Macy's credit card, including the All President's Club benefit and the 45% lifetime discount for her lifetime to the extent as authorized by Macy's and the All President's Club program. The defendant shall sign all necessary documents to put this order into effect. This is property distribution and is not in the nature of periodic alimony.
30. All payments made by the defendant to and for the benefit of the plaintiff, directly or indirectly, during the pendency of this matter until the date of the decision shall not be taxable to the plaintiff nor deductible to the defendant as periodic alimony.
31. An issue arose during trial concerning certain group life insurance policies in the estimated face amount of $13,000,000 insuring the defendant's life with premiums being paid for the most part by GE as an employee benefit which policies were owned by a January 22, 1993 irrevocable life insurance trust. The issue was, could the court order a change in these policies, and if not, could the court order the defendant to obtain new life insurance policies at his own cost and expense. The legal status regarding the irrevocable life insurance trust was not fully presented at trial. The parties attempted to deal with that issue by filing a post trial stipulation on April 7, 1997.
Despite that stipulation the court will, 1) not order the defendant to obtain additional life insurance coverage since the CT Page 13670 plaintiff has sufficient assets and sufficient security concerning the periodic payments ordered by this court due to the extent of the defendant's assets, and 2) not modify, change or make any orders as to the irrevocable life insurance trust dated January 22, 1993 because of the adverse estate tax consequences, the effect of such modification on the heirs of the parties, the heirs were not joined as parties in this case, the heirs were not represented by counsel in this matter, and both parties agreed in writing in 1993 to establish such an irrevocable transfer of the insurance policies. Thus, the plaintiff will remain as trustee under said trust agreement, and neither party is permitted any action that would adversely affect said trust or the life insurance policies owned by said trust.
The above orders will remain the orders, notwithstanding the fact that the court did not hear testimony concerning the January 27, 1993 Irrevocable Life Insurance Trust. In the event neither party files a written motion within 20 days from the date of this decision (which date shall not be extended under any circumstances) to hear additional evidence pursuant to C.G.S. § 46b-4 and Ross v. Ross, 172 Conn. 269, 273 (1977), the above orders will be the final orders of this court.
32. The IRAs that are presently listed in the names of the plaintiff and the defendant will become their own separate property free and clear of any and all claims by the other party.
33. The parties have been ordered to divide equally the joint checking accounts pursuant to paragraph 5 hereof. All checks that have been written prior to December 3, 1997 shall be paid and cleared from that account. The parties shall then equally divide the checking account.
34. The parties lease their automobiles. The automobile leases do not appear in the defendant's financial affidavit as an asset, liability or expense. The automobiles do not appear in the plaintiff's financial affidavit as an asset or liability. The plaintiff does include two automobiles on the expense section of her financial affidavit: Jeep $530/month and Jaguar $750/month. Neither party offered any evidence as to any vehicle, Exhibit 91. The vehicles are not included in the parties' last annual financial statement. Exhibit 70. A portion of the lease cost paid by GE is taxable income. Exhibit 91. Neither party referred to any vehicles in their Claims for Relief nor asked for any court orders in regards to motor vehicles. There was no testimony about CT Page 13671 motor vehicles nor did any of the exhibits refer to the motor vehicles. The court concludes that each party has sufficient liquid assets to be able to purchase or lease and maintain personal transportation. This court will enter no orders in regards to automobiles.
35. The parties shall execute all Qualified Domestic Relations Orders (QDRO) and/or Domestic Relations Order (DRO) as may be required as well as all deeds, transfers, conveyances, assignments and any other such documents that are necessary to comply with the orders of this court. This court will retain continuing jurisdiction concerning the execution, preparation, modification and signature of any of those documents, including the terms and conditions of any and all QDROs and/or DROs that are needed to accomplish the purposes of this order.
36. The plaintiff shall pay her portion of any taxes which may be assessed as a result of: the exercise and/or division of any of these assets to her, the distribution or division of these assets to her, any accrued income contained in the assets that have been distributed to her and the percentage that income relates to the entire principle and accrued income of that asset. The plaintiff shall hold the defendant harmless therefrom.
37. The defendant shall pay his portion of any taxes which may be assessed as a result of: the exercise and/or division of any of these assets to him, the conversion of any stock units, the exercise of any stock options, the distribution or division of these assets to him, any accrued income contained in the assets that have been distributed to him and the percentage of that income relating to the entire principle and accrued income of those assets. The defendant shall hold the plaintiff harmless therefrom.
38. A contingent wage execution shall issue. Both parties are ordered to sign the appropriate court documents in that regard.
39. The distribution and division of these assets are based upon the latest numbers furnished to the court at oral argument on February 27, 1997. The court notes that these numbers have no doubt changed since February 27, 1997. The court must consider values as of the date of dissolution. Sunbury v. Sunbury,216 Conn. 673, 676 (1990). This court has covered the subject of the date of valuation in the Memorandum of Decision including the fact that this is a large and volatile asset case in which the CT Page 13672 value of their principal asset, various holdings of GE common stock, has virtually doubled since the parties' separation. The court believes that no further orders are needed. Notwithstanding that fact, the court will consider a Motion for Articulation and/or Reargument regarding any change in the value of the property from February 27, 1997, the last hearing date, to the date of dissolution. Sunbury, supra 676-77; P.B. 204A, 204B, 326, 4051 and 4059; C.G.S. § 46b-4.
40. The court finds that it is likely that one or both of the parties will appeal this decision and that issues may be raised as to whether or not said appeal or appeals automatically operate as a stay of execution pursuant to P.B. 4046. The plaintiff has filed motions pursuant to P.B. 4047 seeking post-judgment relief which motions were filed prior to judgment. In accordance with the above authority and Yontef v. Yontef, 185 Conn. 275, 293-94
(1981) this court enters the following orders:
A stay of execution shall issue as to all orders set forth in this decision except as 1) exclusive possession in paragraph 1, 2) periodic alimony in paragraph 3, 3) periodic payments of "dividend equivalents" in paragraph 18 and 4) the dissolution of the marriage. Tessitore v. Tessitore, 31 Conn. App. 40, 46 fn. 5 (1993); Santoro v. Santoro, 33 Conn. App. 839, 840 (1994). As to the orders of exclusive possession of the marital home pursuant to paragraph 1, periodic alimony pursuant to paragraph 3 to "dividend equivalents" pursuant to paragraph 18 and the dissolution of the marriage, there shall be no stay of execution. P.B. 4046. In the event any of these four orders are not automatically stayed pursuant to P.B. 4046, this court hereby terminates any stay of execution as to said four orders subject to the parties' filing a Motion for Review under P.B. 4053. P.B. 4049. In addition both parties are bound immediately to the "automatic orders" set forth in P.B. 1204 (1), (2), (7) and (8) until these orders are terminated, modified or amended by further order of the court upon motion of either of the parties.
41. Counsel for the plaintiff shall prepare at her own expense the judgment file, deeds, conveyance documents and any Qualified Domestic Relations Orders and/or Domestic Relations Orders.
By the court,
TIERNEY, J.
CT Page 13673