Filed 5/30/25  Smittcamp v. Smittcamp CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANNETTE SMITTCAMP, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BRENT SMITTCAMP, <br><br> Defendant and Respondent. | F087697 <br><br> (Super. Ct. No. 21CEPR00868) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Complex Appellate Litigation Group, Michael von Loewenfeldt and Claudia Ribet; Coblentz Patch Duffy & Bass and Frank Busch for Plaintiff and Appellant.

Loeb & Loeb, David C. Nelson and Lilian Walden Givens for Defendant and Respondent.

-ooOoo-

# INTRODUCTION

This appeal arises from two probate actions initiated by Annette Smittcamp (Annette) stating various causes of action after the death of her husband, Robert Smittcamp (Bob).[1] Relevant on appeal, Annette sought an order determining her interest in property held in Bob's family trust pursuant to Probate Code section 850, subdivision (a)(3)(A), and she sought to invalidate a 2020 restatement of the Robert E. Smittcamp 2012 Family Trust (Family Trust) pursuant to Probate Code section 17200 and Family Code section 2040.

After a five-day bench trial, the trial court concluded a 2017 special bonus Bob received from his company was a mixed-character asset, and the court apportioned approximately $1.8 million of that bonus to the community. Relying on a total recapitulation family expense tracing model, the court concluded community income was vastly exceeded by community expenses and there was no remaining community property for distribution. Finally, the trial court declined to invalidate the 2020 restatement of Bob's Family Trust as a remedy for Bob's violation of the automatic temporary restraining orders (ATRO's) under Family Code section 2040 in modifying the Family Trust without Annette's consent or an order of the court.

On appeal, Annette argues that in characterizing Bob's 2017 special bonus, the trial court misapplied *In re Marriage of Lehman* (1998) 18 Cal.4th 169 (*Lehman*), and admitted irrelevant evidence regarding Bob's company's motivation to conclude Bob had any separate property interest in the bonus. Annette also maintains the trial court impermissibly relied on a total recapitulation tracing method in finding Brent Smittcamp (Brent) had proven by a preponderance of evidence that disputed property acquisitions during the marriage were Bob's separate property. Finally, Annette argues the trial court

---

[1] We refer to the parties by their first names, as they all share the same surname. As the parties, witnesses and trial court all referred to Robert Smittcamp as Bob, we do likewise for consistency.

was required to void the 2020 restatement of the Family Trust as a remedy for Bob's violation of the ATRO's.

Having considered the parties' arguments, we affirm the judgment. The trial court did not circumvent *Lehman* or admit and rely on inadmissible evidence of motivation in determining whether the community had an interest in the bonus. Further, in the circumstances presented, the trial court did not err in relying on a total recapitulation tracing method in concluding community expenses exceeded community income over the duration of the marriage such that disputed property acquisitions during the marriage were necessarily Bob's separate property. And, although Bob violated the ATRO's, the trial court did not abuse its discretion in determining voiding the 2020 restatement of Bob's Family Trust was too harsh a remedy.

## FACTUAL BACKGROUND

Bob and Annette met in 2005 and were eventually married on June 13, 2015. They remained married until Bob passed away on March 4, 2021. Bob had three adult children from a previous marriage (Brent, Lisa and Brandon), and Annette has two adult children from a previous marriage (Michael and Steven).

When the couple married in 2015, Bob was the President and Chief Executive Officer (CEO) of Lyons Magnus, Inc. (Lyons Magnus), a privately held, family owned food company in Fresno, and a related company, Lyons Magnus East, Inc. (Lyons East), headquartered in Kentucky (collectively, Lyons). Bob and his father acquired Lyons Magnus in 1971, and Bob first served as President and then, later also as CEO. In 1999, Bob led Lyons Magnus into building a facility in Kentucky, which became Lyons East.

In April 2015, Bob initiated efforts to sell Lyons. By 2017, when a sale of the companies was being contemplated, Bob, according to his tax counsel David Lyon, began expressing remorse about how much equity in Lyons he had transferred to others in the past. Mr. Lyon formulated a tax efficient plan to transfer some of the equity in the companies to Bob through a special, one-time $36.5 million bonus comprised of Lyons

stock and cash.[2] The stock award agreements regarding that bonus between Lyons and Bob recited that the grant of stock was "made in consideration of the services rendered and to be rendered by [Robert E. Smittcamp] to the Company and its affiliates." The bonus was paid in September 2017. Subsequently, although the Internal Revenue Service (IRS) first challenged Lyons East's tax deduction claimed for the bonus paid to Bob, the IRS ultimately rescinded its challenge. For tax purposes, Lyons East established to the IRS's satisfaction that, although the bonus constituted an excess parachute payment, it was deductible to the corporation as reasonable compensation paid in consideration of Bob's work for Lyons over 46 years, and it was paid pursuant to the shareholder approval exemption for taxes on excess parachute payments under section 280G(b)(5) of title 26 of the United States Code.

Lyons was sold on November 9, 2017, to an unrelated third party for $424 million. With the bonus stock he acquired in September 2017, Bob realized $85 million from the sale of the company. Of that amount, $10 million in stock was reinvested with the company under its new ownership. The remainder of the funds was deposited into a Wells Fargo account on December 15 and 18, 2017. From there, $63 million of the funds were transferred to Bob's brokerage account. Bob subsequently reinvested approximately $57 million, acquiring interests in a series of family limiting partnerships (LP's), among other acquisitions.[3]

In February 2017, Bob established "'The Robert E. Smittcamp 2017 Charitable Remainder Trust'" (CRT), which was funded with Bob's separate property. Upon Bob's

---

2    Because the companies are collectively referred to as Lyons, and because the trial court referred to David Lyon as Mr. Lyon, we maintain the title designation for consistency and to clearly differentiate between the companies and this individual.

3    The parties dispute whether two of the acquisitions were made during marriage, including Bob's interests in Smittcamp AG Enterprises Series D Stock and the Smittcamp AG receivable.

4.

death, Brent became the sole trustee and Annette became the income life beneficiary. At the time of Bob's death, the trust was valued at approximately $14.3 million.

In 2012, before his marriage to Annette, Bob created the Family Trust. On November 14, 2019, Bob amended and restated the Family Trust to include the following provision:

> "The Trustor has established the Robert E. Smittcamp Charitable Remainder Trust ('CRT'). If ANNETTE SMITTCAMP is living at the time of Trustor's death, Trustor authorizes and directs Trustee to distribute the difference between Fifteen Million Dollars ($15,000,000) and the principal balance of the [CRT], which difference shall, in all events, not be less than Five Million Dollars ($5,000,000), to ANNETTE SMITTCAMP. If ANNETTE SMITTCAMP is not living at the time of Trustor's death, this gift shall lapse."

In addition, the Family Trust was amended to leave a $250,000 gift to each of Annette's two adult sons. The amendment to the trust names Brent as the successor trustee upon Bob's death.

Bob and Annette confronted marital difficulties; Bob filed for divorce on July 17, 2019, and Annette filed separately for divorce on July 22, 2019. In early 2020, Bob emailed his divorce attorney: "Annette advised me she had cancelled her filing against me which is untrue. We need to figure out our next step with respect to a divorce." Bob's estate planning attorney contacted Bob's divorce attorney a few days later, indicating that "Bob would like to remove Annette and her sons from his estate plan."

In May 2020, while the divorce proceedings were pending, Bob again amended the Family Trust. The only change made was to revoke and remove the $5 million gift to Annette and the two $250,000 gifts to her children. The 2020 revision to the Family Trust made clear Annette was not to receive anything from the Family Trust or his estate:

> "The Trustor is married to ANNETTE RUOCCO. There is an action pending, or soon will be pending, in a California Superior Court for the dissolution of Trustor's marriage to ANNETTE RUOCCO. Trustor has caused ANNETTE RUOCCO to be named as an income beneficiary,

5.

effective at Trustor's death, of a [CRT] formed by Trustor. It is Trustor's express intention and with full knowledge that ANNETTE RUOCCO not otherwise take from or be a beneficiary of Trustor's Trust Estate or any other estate in which Trustor has an interest."

Also on May 6, 2020, Bob similarly amended his will to include a nearly identical provision stating that Bob had named Annette as an income beneficiary of the CRT at his death, but that it was Bob's "express intention" that Annette "not otherwise take from or be a beneficiary of [Bob's] Trust Estate or any other estate in which [Bob has] an interest."

Annette and Bob continued to work on their relationship, the divorce proceedings did not progress and they did not separate. Their respective attorneys continued to work on negotiating a financial agreement that would resolve some of the marital issues. Bob died on March 4, 2021, and the divorce petitions were subsequently dismissed. In August 2021, Annette filed a petition (which was amended in 2022) seeking a determination under Probate Code section 850 of her community property interest and transfer of those assets to her; a determination under Probate Code section 17200 that the 2020 restatement to the Family Trust was invalid; and other claims not relevant to this appeal. A five-day bench trial was held in August 2023, and the court issued a proposed statement of decision on January 5, 2024.

Among other things, the court's proposed statement of decision recognized a community property interest in Bob's 2017 bonus and apportioned $1,893,533 of it to the community; applied a family expense total recapitulation tracing method to conclude community expenses had exceeded community income during the marriage such that there was no remaining community property at the time of Bob's death; and denied Annette's claim seeking to void the 2020 restatement of the Family Trust. Annette objected to the proposed statement of decision; the trial court overruled the objections, and concluded its proposed statement of decision would be its final decision.

6.

## DISCUSSION

### I.    Bob's 2017 Bonus

Annette challenges the trial court's characterization of Bob's 2017 special bonus. The trial court determined the bonus was "unquestionably community" in nature, but determined the community and Bob's separate property estate owned an interest in it and apportionment was required. Relying heavily on tax attorney David Lyon's testimony, the court found the bonus was more equivalent to a retirement bonus or a pension than a wage or a salary because it compensated Bob for work he had performed both before and during the marriage, and that it must be apportioned as a result. The court employed the time rule and allocated $1,893,533 of the bonus as community property.

Annette maintains the court's characterization does not comport with *Lehman* because it fails to recognize the legal right to the bonus was acquired entirely in 2017— during the marriage; Bob acquired no right to the bonus at any time before 2017, and, thus, none of the bonus can constitute his separate property. Additionally, Annette claims that in characterizing the special bonus, the trial court erroneously admitted and relied on irrelevant evidence of Lyons's motivation for paying it. Annette also asserts the trial court erroneously failed to give binding effect to Brent's response to a request for admission (RFA) that admitted Bob's entire 2017 special bonus was community property.

Brent responds that while the community has an interest in Bob's 2017 special bonus, apportionment is nonetheless required because the bonus was compensation for Bob's work efforts both before and during the marriage. Brent maintains the trial court made a factual finding supported by substantial evidence that the special bonus was derived from his pre-marital and marital efforts and subject to apportionment, and the trial court properly exercised its discretion to apply the time rule to calculate the respective community and separate property interests.

## A. Additional Background

According to Lyons's tax attorney, Mr. Lyon, Bob expressed donor's remorse that he had given away so much stock ownership in the company over the years, and he asked Mr. Lyon to propose some tax efficient ways to get some of the stock back. Mr. Lyon testified the simplest way to achieve the result Bob sought was to have other shareholders directly gift some of the equity back to Bob, but that was not tax efficient, and presented gift tax implications for the other shareholders. Two other options Mr. Lyon considered included declaring a stock dividend to Bob, and then making a "gross-up payment" as a dividend (full capitalization omitted). This option was not ultimately selected because the dividend would not have been deductible to the company. The third option—the one that was eventually selected—was to give Bob a taxable stock bonus of $20 million and a cash bonus of $16.5 million. If that compensation was supported as reasonable and agreed to by the shareholders pursuant to tax law, this was the most tax efficient solution because the company could claim a deduction for the bonus.

According to Mr. Lyon, the companies took the position that Bob had created extraordinary value through his service to the company over all the years he had worked. Bob had been undercompensated for many years, and he had created tremendous value over the course of his service. In consideration of his lifetime of work for the company, Mr. Lyon felt the special bonus could be supported as reasonable compensation for purposes of Lyons claiming a tax deduction. Mr. Lyon testified the bonus was never meant to compensate Bob for services he rendered to Lyons only in 2017 as opposed to his entire 46 years of service, nor was it ever meant to compensate Bob for his efforts in selling Lyons.

After obtaining all shareholders' consent to the bonus, the two Lyons companies and Bob executed stock award agreements, which recited the grant of stock from each "is made in consideration of the services rendered and to be rendered by [Bob] to the Company and its affiliates." The stock award agreements were executed on

8.

September 28, 2017, and the bonus of stock and cash was paid to Bob by the end of September 2017.

The IRS eventually challenged Lyons East's deduction for Bob's bonus, and a written response was prepared by Mr. Lyon.[4] His response to the IRS explained that, in the summer of 2017, Lyons had determined that in light of Bob's service and his importance to its success, Bob should be the recipient of a stock bonus program. All the beneficial owners of the companies had agreed and acknowledged that since 1971, Bob had spent virtually his entire adult life working to make Lyons successful, outworking every other person and spending long days, nights, and many weekends devoted to Lyons. The response to the IRS laid out the five legal factors relevant to determine whether a payment is considered reasonable compensation for services rendered such that it is tax deductible under relevant tax law provisions. The response also explained the bonus qualified for the shareholder approval exemption pursuant to section 280G(b)(5) of title 26 of the United States Code, as more than 75 percent of the voting power of the outstanding stock approved the payment after full disclosure of the material facts.

The IRS ultimately agreed with Lyons East's position, and determined no adjustment to the claimed deduction was warranted.

B.      Standard of Review

The factual findings that underpin characterization are reviewed for substantial evidence (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984 (*Finby*)), but when the "'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values,' the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law. [Citation.] As such, it is examined de novo." (*Lehman, supra*, 18 Cal.4th at p. 184.) Issues concerning the

---

[4]      The IRS's inquiry was directed to Lyons East only.

valuation and apportionment of community property are reviewed for abuse of discretion. (*Id.* at p. 187; *Finby, supra*, at p. 984.)

### C. Analysis

#### 1. Admissions During Discovery

As an initial matter, Annette maintains the characterization of Bob's 2017 bonus wholly as community property was admitted by Brent in responses to Annette's RFA's during discovery. Annette argues the trial court abused its discretion in denying her pretrial motion in limine to preclude any argument or evidence the bonus was anything other than community property.

Annette propounded RFA's on Brent, including RFA No. 49 that asked Brent to "[a]dmit that Robert E. Smittcamp's compensation from Lyons Magnus, Inc. in 2017 is **COMMUNITY PROPERTY** in its entirety." Subject to a preliminary statement and general objections, Brent admitted this RFA.

Prior to trial, Annette moved in limine to preclude any evidence contrary to this admission that all 2017 compensation from Lyons was community property. Annette argued the undisputed evidence showed Bob received $38,251,500.16 in compensation from Lyons, which was reflected on his W-2 form for 2017. Brent admitted in deposition that the purpose of a W-2 is to report compensation, and that the W-2 forms listed Bob's total compensation for the stated year. Annette argued Brent was conclusively bound by his unambiguous admissions that Bob's compensation from Lyons in 2017 was community property in its entirety.

Brent responded that Annette's argument misconstrued the response to RFA No. 49 by grossly oversimplifying the issue of Bob's "'compensation.'" According to Brent, the amount listed on Bob's W-2 included both his salary and a separate one-time special bonus. RFA No. 49 did not mention the special bonus, and it generically referred to Bob's "'compensation'" in 2017 without defining the term. Brent maintained his response to RFA No. 49 was not intended to admit, and did not admit, that the entirety of

10.

the special bonus, or any particular amount of the special bonus, was community property.  Further, Brent argued, this was demonstrated by Brent's response to RFA No. 48, which clearly denied that Bob's "'compensation'" in 2017 included the special bonus.  Brent further argued that his deposition testimony is not relevant to what Brent intended in response to RFA No. 49.  At his deposition, Brent was asked if the purpose of a W-2 is to report compensation, and he answered, "'Correct.'"  He was never asked whether everything reported on Bob's W-2 in 2017 was "'compensation'" earned by Bob "'in 2017.'"  Finally, Brent argued, in addition to his contemporaneous response to RFA No. 48 denying that Bob's "'compensation'" in 2017 included the special bonus, Brent articulated his position concerning the special bonus on numerous occasions after the RFA's were served, including in his supplemental response to form interrogatory 17.1 with respect to RFA No. 48.  Indeed, Brent asserted, he had never taken a position consistent with Annette's interpretation of Brent's response to RFA No. 49, and, instead, has always maintained that, at most, only a small part of the special bonus is community property.

The trial court denied Annette's motion in limine for the reasons articulated in Brent's opposition.  Annette now argues the ruling was an abuse of discretion.

The purpose of the RFA procedure is "to expedite trials and to eliminate the need for proof when matters are not legitimately contested."  (*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 783.)  As a result, any matter admitted in response to a RFA is conclusively established against the party making the admission, unless the court has permitted withdrawal or amendment of the admission.  (Code Civ. Proc., § 2033.410, subd. (a); *Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 736.)

A response to a RFA that is subject to different meanings does not conclusively establish a fact.  (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 260; *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 360; *Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 277–278.)  "Although admissions are dispositive in most cases, a

11.

trial court retains discretion to determine their scope and effect. An admission of a fact may be misleading. In those cases in which the court determines that an admission may be susceptible of different meanings, the court must use its discretion to determine the scope and effect of the admission so that it accurately reflects what facts are admitted in the light of other evidence." (*Fredericks, supra*, at p. 277.) "'"Generally, a trial court's ruling on an in limine motion is reviewed for abuse of discretion."'" (*Inzunza v. Naranjo* (2023) 94 Cal.App.5th 736, 742.)

We find no error in the court's ruling. The term "compensation" was undefined in the RFA's, and the court properly exercised its discretion to conclude that Brent's admission to RFA No. 49 did not extend to the 2017 bonus. (*Burch v. Gombos, supra*, 82 Cal.App.4th at p. 360 [a response subject to different meanings does not conclusively establish a fact].) Brent had already signaled a different interpretation of the term "compensation" in the immediately preceding RFA No. 48, wherein he denied that "Robert E. Smittcamp received compensation from Lyons Magnus, Inc. that included … 20 million shares of Lyons Magnus stock in 2017." The trial court did not abuse its discretion in determining Brent's admission to RFA No. 49 did not include the special bonus as part of the "'compensation'" Bob received from Lyons in 2017.

### 2.    Characterization of the 2017 Special Bonus

Family Code section 760 states as follows: "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." "'[T]he presumption, … that property acquired during the marriage is community, is perhaps the most fundamental principle of California's community property law,'" and reflects the "'"general theory … that the husband and wife form a sort of partnership, and that property acquired during the marriage by the labor or skill of either belongs to both."'" (*In re Brace* (2020) 9 Cal.5th 903, 914, quoting *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1408–1409 (conc. opn. of Chin, J.) (*Valli*).)

12.

Characterizing the status of property interests as community or separate property is the "foundational starting point" for resolution of marital property rights and obligations. (Hogoboom & King et al., Cal. Practice Guide: Family Law (The Rutter Group 2024) Property Characterization, ¶ 8:30.) Generally, in characterizing an asset, "'[e]ach spouse's time, skill and labor are community assets, and whatever each spouse earns from them during marriage is community property.'" (*In re Marriage of Harrison* (1986) 179 Cal.App.3d 1216, 1226 (*Harrison*).) Fringe benefits such as stock or stock options "are not a gift from the employer but are earned by the employee as part of the compensation for services. [Citations.] Thus fringe benefits … are community property to the extent they are earned by the time, skill and effort of a spouse during marriage." (*Ibid*.)

In characterizing Bob's 2017 special bonus, the trial court found there was a community interest because the right to the bonus was acquired during marriage. The court reasoned, however, the bonus was more equivalent to a retirement asset or a pension than a wage or salary because it was received as consideration for the work Bob had performed for Lyons over many decades, both before and during the marriage. Due to this, the court concluded the 2017 special bonus had to be apportioned to account for the separate and community interests.

### a) *Lehman*

Annette first contends the trial court's characterization is legally incorrect because it misconstrues the accrual concept articulated in *Lehman*. There, the California Supreme Court considered the characterization of an enhanced retirement benefit that was offered to an employee-spouse as an early retirement incentive after marital dissolution. (*Lehman, supra*, 18 Cal.4th at p. 175.) The right to the underlying pension benefits was acquired during the marriage, and thus the nonemployee spouse (wife) owned a community property interest in the employee-spouse's (husband) retirement benefits under a defined pension plan. (*Id.* at pp. 174–175.) The husband argued the wife had no

13.

community property interest in the retirement benefits *as enhanced* because the enhancement incentive was acquired through a postseparation contract independent of any right to the underlying retirement benefits. (*Id.* at p. 185.)

Drawing on its reasoning in *In re Brown* (1976) 15 Cal.3d 838 (*Brown*), the *Lehman* court first explained that generally, all property acquired by a spouse during marriage before separation is community property, which may include the right to retirement benefits an employee-spouse acquires as deferred compensation for services rendered. (*Lehman, supra*, 18 Cal.4th at p. 177.) As held in *Brown*, the community's right to retirement benefits acquired during marriage exists whether or not the right to the benefits was "'vested' in the sense of 'surviv[ing] … discharge or voluntary termination,' and whether or not it is 'matured' in the sense of amounting to an 'unconditional' entitlement 'to immediate payment.'" (*Lehman, supra*, at p. 177, quoting *Brown, supra*, at p. 842.) "What is determinative," *Lehman* reiterated, "is not any 'abstract terminology'" about whether the benefits are vested, nonvested, matured, or conditional, "but rather a single concrete fact—time. The right to retirement benefits 'represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment' during marriage before separation, it 'comprise[s] a community asset .…'" (*Lehman, supra*, at p. 177, quoting *Brown*, *supra*, at p. 842.) "'Throughout our decisions, we have always recognized that the community owns all [such] rights attributable to employment during marriage' before separation. [Citation.] [¶] The right to retirement benefits is a right to 'draw[] from [a] stream of income that … begins to flow' on retirement, as that stream is then defined." (*Lehman, supra*, at p. 177.) "[I]f the right to retirement benefits accrues, in some part, during marriage before separation, it is a community asset and is therefore owned by the community in which the nonemployee spouse as well as the employee spouse owns an interest." (*Id.* at p. 179.) Regardless of how the employee-spouse may change or terminate the employment, agree to a modification of the terms of the employment, or elect between alternative retirement programs, "'the nonemployee

14.

spouse owns an interest' in what he or she chooses by owning an interest in the community." (*Ibid.*) The court rejected the husband's argument the enhanced benefits were acquired through a postseparation contract, pointing out that by its own terms, the enhanced benefit resulted from "'improvements to the retirement benefit formula'" under the company's existing defined benefit retirement plan, not from a new plan altogether. (*Lehman, supra*, 18 Cal.4th at p. 186.) The court likewise rejected the husband's assertion the wife did not own a community property interest in the retirement benefits as enhanced because the enhancement amounted to a severance payment. The court reasoned the enhancement plan itself was named an "increase *in retirement benefits*," signaling the enhancement derived from the underlying retirement benefits. (*Ibid.*) In reaching this outcome, the court explained "that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. That is because, practically by definition, the right to retirement benefits that accrues, at least in part, during marriage before separation underlies any right to an enhancement." (*Lehman, supra*, 18 Cal.4th at pp. 179–180.) \

However, the court pointed out, although the nonemployee spouse owns a community property interest in the employee-spouse's retirement benefits as enhanced "does *not* mean that the enhancement is a community asset *in its entirety*. But the question what extent such an enhancement belongs to the community and separate estates is one of apportionment and not characterization." (*Lehman, supra*, 18 Cal.4th at p. 180.) The court then held apportionment of the enhanced benefits under the time rule was not unreasonable because the amount of the retirement benefits was substantially related to the number of years of service, and, thus, use of the time rule was a reasonable and fair representation of the relative contributions of the community and separate estates. (*Id*. at p. 187.)

### b) Post-*Lehman* Authority

*Lehman* was applied by the court in *In re Marriage of Kelpe* (2021) 64 Cal.App.5th 103 (*Kelpe*) to conclude that an executive top-hat retirement plan, the right to which was acquired *after* separation, was solely the separate property of the employee-spouse (husband), despite that the benefits paid under that plan were defined by a formula that included years of service when the employee had been married. (*Id.* at pp. 106–107.) The *Kelpe* court explained there was no way the community could have acquired an interest in the top-hat plan, as the plan was separate from, and not derivative of, the right to retirement benefits available to the husband during the marriage. (*Id.* at p. 110.) In rejecting the wife's argument the right to receive benefits under the top-hat plan accrued during marriage because it counted 13 years of employment during the marriage to qualify for benefits under the plan, the court explained that "if the contractual right to the benefit is not acquired until after separation, the benefit is separate property." (*Ibid.*)

Extending *Kelpe*'s application of *Lehman*, Annette maintains that because the legal right to the 2017 bonus was acquired *only* during the marriage, the bonus is community property in its entirety just as the top-hat plan in *Kelpe* was solely the separate property of the husband because the legal right to it was acquired postseparation. Annette contends that, unlike deferred compensation retirement benefits, Bob's legal right to the 2017 special bonus did not accrue day by day as services are performed but, rather, all at once during the marriage. As a result, Annette argues, Bob had no separate property interest in the bonus even though it was earned through decades of work performed prior to the marriage.

The right acquired from an employee's defined pension benefits "is a contractual right, derived from the terms of the employment contract." (*Brown, supra,* 15 Cal.3d at p. 845.) It is "'*the right to share in the pension as it is ultimately determined*'" (*Lehman, supra*, 18 Cal.4th at p. 184, quoting *Olivo v. Olivo* (1993) 82 N.Y.2d 202, 210); "[i]t is a right to draw from a stream of income that begins to flow, and is defined, on retirement"

(*Lehman, supra*, at p. 183). That right is often subject to contingencies and vesting schedules, but the legal right to it is acquired and becomes a divisible property interest once the employer cannot unilaterally repudiate the right without terminating the employment. (See *Brown, supra*, at p. 842.) If this right is acquired during the marriage, the benefit is stamped a community asset from then on. (*Lehman, supra*, at p. 183.) But if the benefits paid under that right are earned through work performed during and after the marriage, the extent of the community's interest is subject to apportionment. (*Id.* at p. 180 [the fact that a nonemployee spouse owns a community interest in the employee-spouse's retirement benefit as enhanced "does *not* mean that the enhancement is a community asset *in its entirety*"]; *In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1094–1095 (*Drapeau*) [legal right to enhanced retirement benefit acquired during marriage meant community owned an interest, but benefits paid pursuant to that right were earned by work performed during and after marriage; benefit was a mixed-character asset and required apportionment].)[5]

Subject to certain exceptions (see, e.g., *In re Marriage of Moore* (2014) 226 Cal.App.4th 92, 105–106 [sick leave is separate property when paid after dissolution and before retirement even though earned during marriage]), when the community acquires a property interest in employment fringe benefits during marriage, those benefits are community property only "to the extent they are earned by the time, skill and effort of a spouse during marriage." (*Harrison, supra*, 179 Cal.App.3d at p. 1226.) For example, the appellate court in *Finby* applied *Lehman* and held that an employee-spouse's work

---

5    All the qualifying years of service that gave rise to the legal right to the enhanced retirement benefit in *Drapeau* were performed during the marriage. (*Drapeau, supra,* 93 Cal.App.4th at p. 1093 [benefit "payable pursuant to a contract entered into during the parties' marriage," and "all 10 years of qualifying employment also took place before the parties' separation"; thus, benefit "derived from a contractual right acquired during the parties' marriage" and, under *Lehman*, was required to be characterized as community property, but still subject to apportionment].)

bonuses constituted both separate and community property subject to apportionment because, while the rights to the bonuses were acquired during the marriage, the bonuses were contingent on work and performance requirements of the employee-spouse *after* the couple separated. (*Finby, supra*, 222 Cal.App.4th at pp. 989–990.)

This general principle was also applied in *In re Marriage of Green* (2013) 56 Cal.4th 1130 (*Green*). There, the husband served in the United States Air Force for four years prior to marriage. (*Id.* at p. 1133.) A few years later, he began working as a firefighter and participated in the California Public Employees' Retirement System. (*Ibid.*) Three years after that, he married. During the marriage, he elected to buy the four years of service credit for his military service under Government Code section 21024 to add to his years of service in calculating his retirement benefits; when the parties separated, community funds had been used toward the purchase of the military service credit. (*Green, supra*, at p. 1133.) The parties disputed whether to characterize the military service credit as separate or community property—specifically, the difference in value the years of service the credits provided. (*Ibid.*) Our high court concluded that "[b]ecause the husband rendered the service on which the credit was based before the marriage, it was his separate property, except to the extent the community contributed the payments necessary to obtain it." (*Id.* at p. 1141.) Although the value of the four years of credit far exceeded the cost of obtaining it, the difference in value "was not due to what the community contributed—part of the installment payments—but to what [the] husband brought to the community—his military service." (*Id.* at p. 1139.)

Here, the stock award agreements indicate the stock bonus was earned in consideration of the employment services Bob rendered to Lyons during the whole course of his employment—it was not a gift or compensation for work performed only in 2017. Along with the stock award agreements, Mr. Lyon's testimony made clear the bonus was earned and paid in consideration for Bob's entire 46 years of employment, most of which occurred before the marriage, and was not akin to wages or a salary for services Bob

18.

performed solely in 2017.  Like the right to the underlying pension benefits in *Lehman*, the right to the bonus was clearly acquired during the marriage, thus there was a community interest in the bonus.  Nevertheless, as with the enhanced retirement benefits in *Lehman*, while there was a community property interest in Bob's 2017 special bonus, that "does *not* mean that [it] is a community asset *in its entirety*."  (*Lehman, supra*, 18 Cal.4th at p. 180.)

### c)      Annette's Extension of *Lehman* is Unwarranted and Undermines Basic Community Property Precepts and Substantial Justice

We are unpersuaded by Annette's argument the community and separate property estates had an interest in the enhanced pension benefits in *Lehman* only because the right to a defined pension benefit accrues day by day, and the husband thus acquired a distinct property right in his pension benefits after dissolution, which gave rise to a separate property interest.  We find little support in *Lehman* for this proposition.  The basic accrual concept articulated in *Brown* and extended in *Lehman* applies to determining whether *the community* has a divisible property right in an employee-spouse's retirement benefits. That is a threshold issue because the community has *no* interest in the employee-spouse's employment benefits if no right to them was acquired during the marriage.  For that reason, *Lehman* distinguished *In re Marriage of Lawson* (1989) 208 Cal.App.3d 446, 448–454, where the court held a nonemployee spouse owned *no* community interest in a severance payment given to an employee-spouse after separation—there was nothing acquired by the employee-spouse during the marriage whatsoever that could support a community interest of any kind in that severance benefit (*Lehman, supra*, 18 Cal.4th at p. 186), despite that work performed during the marriage likely gave rise to the offer of a severance benefit.  That is also fully consistent with *Kelpe*, where the legal right to the top-hat plan was acquired after separation.  Applying *Lehman*, the court in *Kelpe* concluded the community had no interest in the top-hat retirement plan, despite that

13 years of work during marriage were counted towards benefits calculated under the plan.  (*Kelpe, supra*, 64 Cal.App.5th at pp. 110–111.)

Once it is determined the community owns an interest in an employee-spouse's fringe benefit under *Lehman*, the community's ownership interest is limited by the extent to which the benefit was earned by the time, skill and effort of the employee-spouse during marriage.  (*In re Marriage of Doherty* (2002) 103 Cal.App.4th 895, 899; *Harrison, supra*, 179 Cal.App.3d at p. 1226 ["[F]ringe benefits such as employee retirement, employer-paid life insurance and employee stock options are community property to the extent they are earned by the time, skill and effort of a spouse during marriage."]; *Drapeau, supra,* 93 Cal.App.4th at pp. 1094–1095 [legal right to early retirement benefit (ERB) acquired wholly during marriage gave rise to a community property interest that was still subject to apportionment as benefits paid pursuant to the right were earned by work performed during and *after* the marriage].)  When it is determined the community owns an interest in property, but the extent of that interest is less than total, the property is necessarily a mixed-character asset and any further inquiry about a separate property interest is irrelevant and serves no useful purpose.  The community and separate interests must be apportioned, where the exact extent of the community and separate property interests will be determined.  (*Lehman, supra*, 18 Cal.4th at p. 180 ["But the question what extent such an enhancement belongs to the community and separate estates is one of apportionment and not characterization."].)  Annette urges a novel theory that misapprehends *Lehman* and conflates our Supreme Court's analysis of whether the community had any interest in the employment benefit with ascertaining whether the asset is community property in its entirety (and if so, is not a mixed-character asset).

Moreover, and importantly, Annette's theory would compel an inequitable division of benefits acquired through community efforts:  the community's ownership interest in Bob's 2017 bonus would be wholly untethered from the community efforts, skill and time

expended in obtaining the benefit during the marriage. The basic property-right accrual concept articulated in *Brown* was adopted, in part, to address the "inequitable division of [property] rights acquired through community efforts"—i.e., the community was being shortchanged by not recognizing the community's property right in nonvested pensions. (*Brown, supra*, 15 Cal.3d at pp. 841–842.) It would be unjust and incongruent to extend a version of this rule under *Lehman* to compel the inequitable division of property acquired through community efforts—i.e., to overcompensate the community for services Bob rendered to Lyons before marriage.

Annette maintains Mr. Lyon's testimony about Bob's consideration supporting the bonus was improperly admitted and relied on, instead of the time of accrual, to characterize the bonus. *Lehman* made clear that characterizing a retirement benefit as the community property of the employee-spouse and the nonemployee spouse, or as the separate property of the employee-spouse alone, does not turn on the employer's motivation in offering the benefit. (*Lehman, supra*, 18 Cal.4th at p. 180.) Annette argues Mr. Lyon's testimony about the 2017 special bonus is entirely irrelevant and inadmissible for purposes of characterizing the bonus because it relates to Lyons's motivation in offering the bonus.

The time of accrual applies to determine whether the community owns any interest in various employee-spouse's fringe benefits. But even when it is determined under *Lehman* that a community owns an interest in an asset, that does not mean it is a community asset in its entirety. (*Lehman, supra*, 18 Cal.4th at p. 180.) Whether it is a community asset in total or something less than total (i.e., a mixed-character asset) requires looking at the nature of the benefit and what portion of it was derived from community efforts. Mr. Lyon's testimony was relevant to this issue; it did not supplant the accrual rule to determine the community's property interest, and it was not motivation evidence prohibited by *Lehman*.

Annette's counsel reiterated at oral argument that examining the nature of the benefit is entirely irrelevant and encapsulates the approach in *In re Gram* (1994) 25 Cal.App.4th 859 (*Gram*) that was disapproved in *Lehman*. (*Lehman, supra*, 18 Cal.4th at pp. 181, 187–188.) Annette maintains that after *Lehman* is applied and it is determined the community owns *an* interest in the asset because a right to it was acquired during marriage, the issue of whether it is a mixed-character asset (i.e., the community interest is something less than 100 percent) depends on whether a separate property interest exists. Annette contends this question turns solely on whether the employee-spouse acquired a property right to the asset at some point outside the marriage, without regard to any evidence about the nature of the asset and the degree to which benefits flowing from the underlying property right were earned with community efforts during the marriage. This is an unwarranted extension of *Lehman* and its disapproval of *Gram*, and is unsupported by cases such as *Klepe* or *Drapeau* on which Annette relies.

*Gram* was disapproved by *Lehman* because it had strayed away from *Brown* in answering the initial question of whether the community owns any interest in the retirement benefit at all. *Gram* had "wander[ed] away in the direction of ad hoc decisionmaking" (*Lehman, supra*, 18 Cal.4th at p. 183) by "invoking a test derived from a series of decisions in the area of severance payments, which looks to whether the benefit in question constitutes deferred compensation for services during marriage before separation or present compensation for loss of earnings thereafter, and after considering what it deemed to be 'relevant factors' identified in those decisions" (*id.* at p. 181, fn. omitted).

Nothing in *Lehman* or its disapproval of *Gram* indicates that, once it is determined the community owns *an* interest in a benefit because a legal right to it was acquired during the marriage, there can be no examination of the benefit's nature to determine whether it is of mixed character or entirely community property—i.e., whether the benefit was earned wholly through community efforts. Indeed, there was no dispute in *Lehman*

regarding whether the enhanced retirement benefit was community property in its entirety (as opposed to a mixed-character asset). The employee-spouse admitted the nonemployee spouse owned *an* interest in the underlying retirement benefits from which the enhancement derived, but claimed there was *no* community interest in the benefits as enhanced. (*Lehman, supra*, 18 Cal.4th at p. 176.) The underlying retirement benefits had been apportioned by the trial court—a finding the employee-spouse did not challenge, and *Lehman* made clear the exact extent of the community and separate property interests was a matter of apportionment, not characterization. (*Id*. at pp. 176, 180.)

Here, whether the community owns any interest at all in the bonus is governed by *Lehman* and is not in dispute—Bob's legal right to the bonus was acquired during the marriage. This question is not answered by considering ad hoc factors as in *Gram*—it does not examine *why* the company paid the bonus, how it was meant to compensate Bob, or what formula was used to arrive at the bonus total. Like this case, *Kelpe* and *Drapeau* involve straightforward applications of *Lehman* on this threshold question. As the right to the top-hat plan in *Kelpe* was acquired solely *after* marriage, the community owned no interest whatsoever, and it was necessarily a separate property asset in total— no further analysis was required.[6]

In *Drapeau*, there was a community interest in an ERB because, under *Lehman*, the legal right to it—obtained through 10 qualifying years of service—was acquired wholly during the marriage. (*Drapeau, supra*, 93 Cal.App.4th at pp. 1090 & fn. 2, 1095.) Importantly, *Drapeau* then answered the second question of whether the ERB was community property *in its entirety* by examining the nature of the benefit—that is the

---

[6] Annette maintains that examining the nature of the benefit to determine whether it is community property in its entirety (and thus not a mixed-character asset) would render the bonus an omitted asset of community property from Bob's first marriage. But just as in *Kelpe*, we observe the legal right to it was not acquired during *that* marriage—the threshold question *Lehman* addressed.

disputed question here. (*Id.* at p. 1095.) The court implicitly concluded it was a mixed-character asset that required apportionment because "[t]he formula which generates the ERB … depends on the employee's number of partnership units; [the nonemployee spouse] concede[d] that units earned after the date of separation are [the employee-spouse's] separate property"; apportionment would determine the exact extent the benefit belonged to the community and separate property estates. (*Ibid.*)

*Drapeau* did not reach its mixed-character-asset conclusion by examining whether the employee-spouse's legal right to the ERB was separately acquired at some point in time outside the marriage (it wasn't); it looked to the nature of the asset and noted the ERB's formula for calculating benefits included units earned after separation. Thus, as the nonemployee spouse conceded, the community's interest was not total, there was a separate property interest in the ERB, and apportionment was required. (*Drapeau, supra*, 93 Cal.App.4th at p. 1095.) After ascertaining whether the community has any interest in property, looking at the nature of the benefit to determine whether the asset is of mixed character does not supplant or even supplement application of *Lehman*, nor does it involve any evaluation of the employer's motivation for offering the benefit—it merely looks at the degree to which the benefit was earned through community efforts.

As Mr. Lyon's testimony and the stock award recitals made clear, Bob's bonus was earned over the entire 46 years that Bob provided services to Lyons, most of which predated the marriage and was not earned with community efforts. Under *Lehman*, the community had an interest in it because the right to the bonus was acquired in 2017, during the marriage. As the nature of the bonus was such that it was earned over time, both before and during the marriage, it was not entirely community property—it was a mixed-character asset subject to apportionment, just as in *Drapeau*. The trial court did not err in characterizing the 2017 bonus.

### 3.     Apportionment

The trial court determined the time rule was an appropriate method for apportioning the bonus between the community and separate estates.

Under the traditional time rule, separate property and community property interests are divided by giving equal weight to each year of service of the employee-spouse, regardless of whether the division occurs early in the spouse's career or closer to retirement. (See *In re Marriage of Belthius* (2023) 88 Cal.App.5th 1, 10.) "While the 'time rule' is the method most frequently used in allocating benefits earned in part during marriage [citation] the time rule is appropriate only where the amount of benefits is substantially related to the number of years of employment." (*Harrison, supra*, 179 Cal.App.3d at p. 1226; accord, *Lehman, supra*, 18 Cal.4th at p. 187 ["Whatever [allocation] method that it may use, however, the superior court must arrive at a result that is 'reasonable and fairly representative of the relative contributions of the community and separate estates.'"].) The trial court's apportionment determination, and the method it selects, is reviewed for abuse of discretion. (*Lehman, supra*, at p. 187; see *In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 166–167 [scope of trial court's discretion to select a method and apportion property is extensive].)

Here, Marie Ebersbacher, who was retained as an expert witness by Brent, opined the bonus should be apportioned equally over the time Bob was employed by Lyons because the 2017 special bonus was earned for work performed over Bob's 46 years of service to Lyons. She calculated the amount of the community's interest as based on the number of days Bob rendered services to Lyons while he was married to Annette (880 days) in proportion to the number of days Bob rendered services to Lyons overall (16,963 days). That percentage was then multiplied by the total amount of the $36.5 million bonus for a total of $1,893.532.98. The trial court implicitly credited Ebersbacher's apportionment method under the time rule. This result accounted for the "'relative contributions of the community and separate estates ….'" (*Lehman, supra*, 18

Cal.4th at p. 187.) There is no basis to conclude Bob's efforts to grow the company's business, and then expand the company by creating Lyons East in 1999, were somehow less valuable than his efforts in later years. We find no error in the trial court's method of apportionment.

## II.      Remaining Division of Community Property

Bob commingled community and his separate property funds during his marriage to Annette. Several assets were acquired during the marriage, which Brent maintains were separate property assets. To establish separate property funds were used to purchase these assets, Brent's expert applied an annual recapitulation method to establish the disputed assets were acquired with separate property funds. The trial court adopted a total recapitulation method for the whole duration of the marriage to conclude there was no community property to distribute to Annette (and thus disputed assets acquired during the marriage were purchased with Bob's separate property), which Annette contends was error. The parties dispute whether the recapitulation method adopted by the court to determine the separate property characteristic of disputed assets acquired during marriage is legally viable because it does not show when disputed assets were acquired or the acquisitions' purchase price, nor does it show that all community property funds were exhausted at the time disputed assets were acquired.

### A.      Additional Background

As noted *ante*, Bob and Annette married in June 2015. Two large home purchases were made during the marriage. In September 2015, Bob and Annette purchased a home for $4.2 million (Magdalena). Annette sold her separate property premarital home for $2.5 million, which was paid to Lyons in 2016 toward the purchase of Magdalena. In December 2019, the couple purchased a condominium in San Francisco for $3,610,484 (Minna). The trial court determined the Magdalena purchase was made with both Annette's and Bob's separate property because there was insufficient community income in 2015 to support that purchase. The court determined everything associated with the

26.

Minna purchase was paid from community income, and to the extent that was insufficient, from Bob's separate property.

Based on the stock he owned in Lyons, Bob received $85 million from Lyons's sale in 2017: $65 million in preexisting separate property stock and $20 million for the special bonus stock. Bob then reinvested (rolled over) $10 million back into Lyons with the acquiring company, and the $75 million dollar balance was deposited into a new account at Wells Fargo (Ranch Account) on December 15 and 18, 2017. On December 28, 2017, Bob transferred $63 million of those proceeds from the Ranch Account to his brokerage account at JP Morgan Chase. Based on comparing Bob's assets at the time of marriage and at the time of his death, Bob acquired the following assets during the marriage:

- 28.5641 percent interest in BRS Holdings LP;
- 28.5641 percent interest in LMSG Holdings LP;
- 28.5641 percent interest in GCT Holdings LP;
- 28.5641 percent interest in BES Holdings LP;
- 50 percent interest in Smittcamp Enterprises, Inc. (SEI);
- 90 percent interest in San Carlos Investments, LLC; and
- Oscar Jimenez Receivable

The interest in the LP's was acquired in late 2020 with brokerage account funds, but there are no corresponding bank records showing the cost of the initial investments or the specific date at the end of 2020 when they were acquired. Annette maintains the following assets were *also* acquired or received during the marriage:

- Smittcamp AG Enterprises Series D Stock;
- Smittcamp AG Receivable;
- Sage Air LLC Receivable; and
- Tax Refund

27.

Brent asserts the trial evidence shows the Smittcamp AG interests relate to Bob's holdover interest in Brent's company, which Bob held since the company's creation in the 1990's. As such, Brent asserts, these are clearly Bob's separate property. Brent points out the trial court did not reference them or include them as marital assets in its statement of decision, and there was no finding they were acquired during the marriage. Annette maintains no evidence about the Smittcamp AG interests were admitted by Brent at trial, and his brief cites portions of interrogatory responses which were not actually admitted.

All Lyons sale proceeds, which included the sale of stock from the 2017 special bonus, and Bob's yearly salary and other earnings were placed into bank accounts to which Annette had no access—the couple had no joint bank accounts. The proceeds from the Lyons sale and the stock bonus were paid into Bob's Ranch Account on December 15 and 18, 2017. In July and August 2019, Bob purchased his interest in the San Carlos Investments ($1,587,000) from the brokerage account; Bob subsequently obtained his interests in SEI and the LP's with funds from the brokerage account at the end of 2020 (together, Bob's interests in SEI and the LP's were valued at approximately $49.8 million at the time of his death).

To establish the separate property character of the assets acquired during marriage, Brent's expert, Ebersbacher, used an annual recapitulation method to eliminate the possibility disputed assets were acquired with community funds and, thus, necessarily purchased with Bob's separate property funds. Ebersbacher calculated the total community income annually during the marriage and then subtracted the annual community expenses. She did not look at any specific time in any year to see when various assets were acquired or how much in community funds was available at that particular time. Because the community expenses far exceeded the community income over the duration of the marriage, Ebersbacher opined there were insufficient funds to acquire any other assets.

Although the parties' experts agreed on many items of community income and expenses, they disagreed as to others, the largest of which was Bob's 2017 special bonus, which Annette maintained was community property in its entirety. Working from the expert's calculations, the trial court made findings about the disputed items of community income and expenses. The trial court concluded that only $1,893,533 of Bob's 2017 special bonus was community property. The trial court credited Michael Miskei, Annette's expert, in finding Bob's efforts on behalf of SEI in 2019 were worth $300,000. The trial court also concluded Bob's perquisites for travel and payroll were paid by Lyons and were not paid back by Bob during his life, thus those perquisites were community income as well as community expenses. The trial court found the value of Bob's role in the San Carlos Investment project was worth $149,766, which constituted community property income. From these findings, the trial court concluded the total net income of the community during the marriage was $5,725,749.

As for disputed community expenses, the trial court found that gifts to Annette's sons and her mother were community expenses ($610,783), and because the parties presented no argument regarding gifts to Annette ($49,319), the court discounted it from the community expenses. By adding the community expenses as found by the trial court, the total community expenses equaled $4,392,130 *before* the acquisition or remodeling expense for the Magdalena or Minna homes was considered. As for the Magdalena home, the court found it was acquired on September 16, 2015, for $4.2 million, and the parties agreed there were no community funds to purchase that property in 2015. The trial court found the Magdalena house was purchased with both Annette's and Bob's separate property assets.

The Minna condominium was purchased in December 2019 for $3,610,484. The court reasoned that normally this would be charged as a community expense as it was acquired during marriage, but, comparing the community income ($5,725,749) and expense totals ($4,392,130), there were insufficient community assets to support the

29.

purchase of Minna. Thus, even without considering any of the *other* assets acquired during the marriage, community expenses far exceeded the community income during the marriage. The court concluded there was no remaining community property for distribution, and implicitly found any *other* disputed acquisitions (i.e., those listed *ante*) during the marriage were necessarily made with Bob's separate property.

**B.  Legal Principles:  Tracing Commingled Property**

As explained by the California Supreme Court, property acquired during marriage is generally presumed to be community property, and "the burden is on the spouse asserting its separate character to overcome the presumption." (*See v. See* (1966) 64 Cal.2d 778, 783 (*See*); accord, Fam. Code, § 760.) "The presumption applies when [one spouse] purchases property during the marriage with funds from an undisclosed or disputed source, such as an account or fund in which [that spouse] has commingled [that spouse's] separate funds with community funds." (*See, supra*, at p. 783, citing *Estate of Neilson* (1962) 57 Cal.2d 733, 742.)

"'Generally, "commingling" is a word of art, used to connote the mixture of separate property or funds with community property or funds.'" (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1474, quoting *In re Marriage of Devlin* (1982) 138 Cal.App.3d 804, 810.) "'It is a familiar rule that separate property may become community property by the process of commingling in such a manner as to make segregation impossible, thus requiring the application of the presumption that it is community property.'" (*Brandes, supra*, at p. 1474, quoting *Pack v. Vartanian* (1965) 232 Cal.App.2d 466, 472.) The commingling of separate property and community property funds does not alter the status of the respective property interests, provided the components of the commingled whole can be adequately traced to their separate and community property sources. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822–823 (*Braud*).) However, if the separate property and community property have been commingled such that the respective contributions cannot be traced and identified, the

entire commingled fund will be deemed community property pursuant to Family Code section 760's general community property presumption. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611 (*Mix*); *See, supra*, 64 Cal.2d at p. 784.) Where assets are commingled, the spouse asserting an asset is separate property bears the burden of overcoming the community property presumption. (*Mix, supra*, at pp. 610–611.)

There are two tracing methods generally utilized to characterize commingled funds: "direct tracing," and "'family expenses" tracing, also called recapitulation tracing. (*Mix, supra*, 14 Cal.3d at p. 612; accord, *Braud, supra*, 45 Cal.App.4th at p. 823; see *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 95, 96 (*Ciprari*) [strict adherence to either "'[d]irect tracing'" or "'[r]ecapitulation'" may not be the only permissible means for tracing under California law].) In direct tracing, the disputed asset is traced to the withdrawal of separate property funds from the commingled account. (*Mix, supra*, at p. 612.) This method requires specific records reconstructing each separate and community deposit, and each separate and community property purchase as it occurs. (*Braud, supra*, at p. 823.)

The family living expense or recapitulation method is based upon the presumption that community/family expenses are paid out of community property funds. (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 20 (*Beam*); *Mix, supra*, 14 Cal.3d at p. 612.) This method requires showing that all community income was exhausted by family expenses at the time the purchase or payment at issue was made. (*Braud, supra*, 45 Cal.App.4th at pp. 823–824.) In other words, "[i]f at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds." (*Mix, supra*, at p. 612, citing *See, supra*, 64 Cal.2d at p. 783.)

"A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence." (See *Valli, supra,* 58 Cal.4th at p. 1400.)

## C.     Standard of Review

As explained, "'"[w]here funds are paid from a commingled account, the presumption is that the funds are community funds. [Citations.] In order to overcome this presumption, a party must trace the funds expended to a separate property source. [Citation.] This issue presents a question of fact for the trial court and its finding will be upheld if supported by substantial evidence."'" (*Ciprari, supra*, 32 Cal.App.5th at p. 94.)

Annette argues Brent's recapitulation tracing method failed to establish community funds were extinguished at the time disputed property was acquired. Because of this deficiency in Brent's recapitulation tracing method, Annette claims the trial court's adoption of it was erroneous as a matter of law. Where a legal issue is presented, or a mixed question of law and fact in which the legal issue predominates, we review it de novo. (*Ciprari, supra*, 32 Cal.App.5th at p. 95.)

## D.     Analysis

Annette argues Brent's expert's annual family expense analysis did not consider specifically when each disputed asset was acquired, or what funds were available when they were acquired; therefore, the analysis was legally insufficient to trace assets Bob acquired during the marriage to his separate property. Annette maintains that, pursuant to the Supreme Court's decision in *See*, family expense tracing cannot establish separate property status by reconstructing total community expenses and income for the duration of the marriage because such an analysis does not demonstrate community funds were depleted at the time that any particular asset was acquired.

Brent contends *See* is distinguishable, and a total recapitulation method remains a legally viable tracing method in view of cases like *Beam* and *Estate of Arstein* (1961) 56 Cal.2d 239 (*Arstein*). Beyond that, Brent argues, the evidence shows $63 million of the

sale of Bob's Lyons stock was placed into his brokerage account in December 2017, segregated from the community's share of the bonus left in the Ranch Account. Brent argues the disputed property was acquired from the brokerage account with Bob's separate property funds.

In *See*, the husband in a dissolution proceeding argued essentially all the assets acquired during a 21-year marriage were his separate property. (*See, supra*, 64 Cal.2d at p. 782.) The husband had received more than $1 million in salaries from two family controlled corporations by whom he was employed. (*Id.* at p. 781.) He managed the family's finances, commingling his salaries during marriage with his separate property. (*Id.* at p. 782.) He sometimes placed wages he earned during the marriage into a separate account, and he used the separate account to pay community expenses and to purchase assets held only in his name at the time of divorce proceedings. (*Ibid.*) Over the wife's objection, the trial court permitted him to prove the community expenses exhausted community income during the entire marriage and, thus, there had been no acquisition of property with community funds. (*Ibid.*) The trial court also permitted the husband reimbursement of his separate property for community expenses he paid. (*Id.* at p. 784.)

The high court rejected the husband's marriage-long, total recapitulation analysis to trace acquisitions during marriage, explaining that the time of acquisition of disputed property was decisive. (*See, supra*, 64 Cal.2d at pp. 783–784.) Because the husband had commingled property but failed to keep adequate records, he could not invoke a total recapitulation method that disregarded whether community funds had been exhausted at the time disputed acquisitions were made during the marriage. (*Id.* at p. 784.) The court reasoned, "[i]f funds used for acquisitions during marriage cannot otherwise be traced to their source and the husband who has commingled property is unable to establish that there was a deficit in the community accounts *when the assets were purchased*, the presumption controls that property acquired by purchase during marriage is community property." (*Ibid.*, italics added.) We do not doubt the vitality of *See*'s basic holding: a

recapitulation method of tracing must be sufficient to establish that community property was exhausted at the time an asset was acquired during the marriage.  But we disagree with Annette's suggestion that *See* rigidly precludes a total recapitulation tracing method in this case, as *See* expressly makes clear there are exceptions.

The scope of *See*'s holding and its limitations on use of the total recapitulation method must be understood through the contextual lens of its analysis and the facts presented.  *See* rejected a broad theory that a proven excess of community expenses over community income during marriage always establishes there has been no acquisition of property with community funds.  (*See, supra*, 64 Cal.2d at pp. 782–783.)  Rather, resort to such a method can be sustained only where, through "no fault" of the spouse asserting the separate property interest, it is not possible to ascertain the balance of income and expenditures at the time the disputed property was acquired.  (*Id.* at p. 783.)  *See* then provided examples such as *Estate of Ades* (1947) 81 Cal.App.2d 334 (*Ades*), where a total recapitulation method without regard to exhaustion of community funds at the time of acquisition was found to adequately establish assets discovered after a husband's death had been acquired before marriage, and were thus separate property (*id.* at p. 339); and *Arstein*, where the community income during the marriage was derived wholly from gains in the husband's separate property and, as such, was subject only to theoretical calculation that could not be ascertained until the time of trial (*Arstein, supra*, 56 Cal.2d at p. 242).  (*See, supra*, at pp. 783–784.)

*See* did not elaborate on the contours of the "no fault" exception in distinguishing *Ades* and *Arstein*, but by examining the facts in *See* and the Supreme Court's subsequent discussion of *See* in *Beam*, we perceive relevant factual guideposts.  While Justice Traynor's recitation of the facts in *See* was not expansive, it suggests the husband's (Laurance) commingling of community and separate funds during the marriage reflected a reasonable possibility of self-dealing, likely to the community's detriment.  Laurance worked as an executive in his family's companies throughout the 21-year marriage,

34.

drawing a sizeable annual salary. (*See, supra*, 64 Cal.2d at pp. 781–782.) He controlled the family finances and chose to commingle his separate funds with community funds, paying community expenses and funding property acquisitions in his name alone from commingled accounts without keeping adequate records. (*Id.* at p. 782.) Moreover, at the time of divorce proceedings, he not only sought to establish various marital acquisitions purchased with commingled funds were his separate property, but also that he was entitled to reimbursement of his separate funds, which he had used to pay community expenses (from commingled funds). (*Id.* at pp. 782, 784.)

In short, Laurance placed himself in an advantaged position, allowing him to benefit with minimal detection. Importantly, in *See,* there was no evidence community expenses routinely exceeded community income during the long marriage. Nor was there any uncertainty or theoretical postseparation calculations about community income that would have precluded accurate, contemporaneous recordkeeping. Additionally, there was no indication Laurance's decisions about expenses and acquisitions (and which funds to pay for each) were *not* meant to benefit his separate property interests. Having placed himself in an advantaged position, the picture that emerges is of a spouse who intentionally chose to commingle funds over a long duration with an eye toward advancing separate property interests without due regard for the interests of the community, culminating in his self-serving claim of separate property and right to reimbursement. Under these circumstances, it is fair to conclude Laurance bore some fault by compromising the community's interests.

In *Beam*, the Supreme Court declined to determine whether the bar on a total recapitulation method in *See* would extend to a case that "involve[ed] no conscious commingling." (*Beam, supra*, 6 Cal.3d at p. 21, fn. 6.) *Beam* involved the dissolution of a 29-year marriage during which all community income was generated exclusively through the husband's management of his separate property investments. (*Id.* at p. 16.)

Under both the *Pereira*[7] and *Van Camp*[8] formulas for valuing the community's interest in the gains and profits of a separate property asset attributable to a spouse's skills, time and efforts expended during the marriage, the community expenses exceeded community income. (*Beam, supra*, at pp. 19–20.) In considering the trial court's application of the total recapitulation method, *Beam* noted, without deciding, that resort to total recapitulation where the spouse has "voluntarily commingled" funds into a single account, as in *See*, may be distinct from the case before it where the spouse had not "conscious[ly] commingled" property throughout the marriage. (*Beam, supra,* at p. 21, fn. 6, italics omitted.) The facts in *Beam* are similar to *Arstein*, a case that *See* distinguished: in both *Beam* and *Arstein*, all community income during the marriage was derived from a theoretical calculation of the value of the husband's efforts and skill in growing his separate property during the marriage.

By distinguishing *Arstein* and *Ades*, *See* recognized there are situations where a total recapitulation tracing method is appropriate. The facts here are very different from *See*, and, when viewed in their entirety, do not establish fault on Bob's part that would preclude the use of a total recapitulation tracing method. Approximately $57 million in disputed assets were acquired after the 2017 bonus and sale of Lyons; it is logical Bob would seek to reinvest a majority of his separate property assets after liquidating most of his interest in Lyons. The commingling that occurred after the sale of Lyons bears similarity to that which occurred in *Arstein* and *Beam*. Bob's 2017 bonus was paid in consideration of his years of employment at his separate property businesses—only about two years of those efforts occurred during his marriage to Annette (880 days). Bob would have had little basis to deduce what of that bonus was community property.

---

[7]     *Pereira v. Pereira* (1909) 156 Cal.1 (*Pereira*).

[8]     *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*).

Additionally, the community income ascribed from Bob's 2019 efforts on SEI's behalf and his efforts toward the San Carlos Investments were theoretical and calculated at trial.

Moreover, when cash proceeds were realized from the stock bonus upon Lyons's sale, a one-time event, segregating the community interest was complicated by a $10 million rollover of Bob's stock into the new company. Notably, Phil James, the Chief Financial Officer for Lyons at the time, testified it was impossible to sort out whether any portion of the bonus stock was part of the stock Bob reinvested with the new company, as distinct from the stock that was sold and paid into the Ranch Account. As a result, any calculation of community income after the stock sale could have been subject to varying assumptions about that reinvestment. But, even if it were assumed the stock in which the community has an interest was paid to Bob at the time of the sale (rather than being reinvested), the actual amount of community interest was ascertained only after a trial. Further, because Bob passed away during the marriage, he is not available to explain his understanding about whether there was any community interest in the bonus stock.

Given the unascertained community interest in the bonus stock at the time of the sale, it is difficult to conceive any accurate, contemporaneous recordkeeping method by which Bob could have directed the reinvestment of $10 million of the stock into the new company (as he did), and then directed a payment from the sale of the remaining stock proceeds that would have made it possible to ascertain the balance of income and expenses when assets were subsequently acquired with these funds. Similar to *Arstein* and *Beam*, these complexities, through no fault of Bob, made it impossible to do so.

Additionally, Ebersbacher offered annual recapitulations showing that community expenses far exceeded income for many years of the marriage, and Bob frequently used his separate property to fund acquisitions for Annette and the community. For example, Bob used his separate property to cover the balance of the purchase price of Magdalena in 2015, a time when both experts agreed there was insufficient community income to

37.

make that acquisition—one that was solely in Annette's name. Thereafter, approximately $1.2 million was spent on renovations for Magdalena, and about $673,000 was paid in capital gains tax for the sale of Annette's separate property home, both of which were paid by Bob.[9] There was a deficit in community income versus expenses in 2018; and, in 2019, community expenses exceeded community income by approximately $4 million, which Bob necessarily paid from his separate property assets. In 2020, the community expenses exceeded income by nearly $500,000.

Given the large expense deficits the community ran in many years that had to be covered with Bob's separate property, and given that his separate property contributions to the community would not be reimbursed, Bob may have seen no need to strictly segregate the funds. Moreover, as already discussed, Bob may not have realized there would be a community interest in the 2017 bonus as it was paid in consideration for work he performed for Lyons over his entire career, almost entirely *before* his marriage to Annette. Nothing suggests Bob's commingling of funds was done to advantage or prioritize his separate property interests, with little or no regard for the community. Indeed, the value of Bob's assets during the six-year marriage to Annette diminished by nearly $28 million. It is difficult to construe the commingling that occurred here as analogous to the type of intentional and conscious commingling of regular salary and separate funds that occurred over the duration of the 21-year marriage in *See*.

Illustrative, too, is *In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322 (*Higinbotham*). There, the husband purchased a house before marriage; after marriage to the wife, the couple lived elsewhere and rented out the husband's house while making payments on it. (*Id.* at pp. 327–328.) The couple did not retain payment records on the rental property; their separate accounts were commingled, and the rent checks were

---

**9** The trial court's findings as to various community expenses and income are incorporated into these totals. The trial court did not address the costs of renovations to Magdalena or the capital gains paid, and it did not calculate those as community expenses.

deposited into both accounts. (*Id.* at pp. 327–328.) The wife managed the money because the husband did not want to keep records or be bothered with it. (*Id.* at p. 328.) After she took a real estate class, the wife told the husband she had an interest in the rental property and referred to it as "'our house'" afterwards. (*Ibid.*) He did nothing to dissuade her from this idea or stop commingling funds. Just before the couple separated, the husband deeded the rental house to his daughter. (*Ibid.*) The trial court concluded the community was entitled to a pro tanto interest in the rental property based on all payments during marriage. (*Ibid.*)

On appeal, the husband argued that an annual recapitulation established by tax returns showed annual income from the property exceeded annual expenses, thus establishing separate income was available to meet the payments. (*Higinbotham, supra*, 203 Cal.App.3d at pp. 329–330.) Beyond that the recapitulation did not show separate funds were actually used to make the payments, the appellate court rejected this argument, reasoning that the husband did not fit into the no-fault exception in *See* to use a total recapitulation method. (*Id.* at p. 330.) He had eschewed recordkeeping involvement because he did not want to be bothered, and he refused to do so even after the wife told him the commingled funds gave the community an interest in the house. Moreover, his attempt to transfer the property to his daughter on the eve of separation supported an inference that he was aware of the community's claim and neglected to take actions to protect against them. (*Ibid.*) Nothing in the circumstances here is similar. Unlike the husband in *Higinbotham*, it is not clear Bob was aware there was a community property interest in the 2017 bonus or the extent of it. Given the uncertainties about the extent of any community interest, it is difficult to know what contemporaneous recordkeeping Bob could have maintained that would have accurately segregated the community's interest in the bonus from Bob's separate property stock and the rest of the sale proceeds.

Similarly distinguishable is *In re Marriage of Simonis* (2023) 95 Cal.App.5th 1129, where the husband commingled property after separation, and then offered a total

39.

recapitulation model to establish community debts paid between separation and trial exceeded community income such that debt was paid with separate property funds. (*Id.* at pp. 1133, 1141.) Nothing in *Simonis* indicated a lack of fault by the husband, especially where he commingled after separation, knowing division of debts and assets would be at issue, and there were no facts suggesting ascertaining the balance of income and expenses was impossible because of theoretical calculations or uncertainties outside the huskband's control or contemplation. (*Id.* at p. 1148.) There was insufficient evidence as to the value of the community assets the husband held during the separation, and thus no way to show the community was insolvent to pay the debts the husband claimed he paid with separate property funds, even for purposes of total recapitulation tracing. (*Id.* at p. 1140.)

Finally, here, although the trial court used a total recapitulation tracing method over the duration of the marriage, Ebersbacher's annualized recapitulations provided additional support for the court's conclusions. Even if the precise balance of community income and expenses could have been determined at any specific point in 2019 or 2020 when various new interests were acquired (by making assumptions the community's entire interest in the bonus was placed in Bob's Ranch Account and incorporating the trial court's findings about various expense and income items—including the $300,000 of theoretical income the trial court credited to the community for Bob's efforts expended on behalf of SEI in 2019 and $149,766 for his efforts toward San Carlos Investments in 2019 and 2020), nothing suggests any significant positive balance of community funds during those years, nor does Annette explain how it would.

In sum, *See* cannot be rigidly understood to preclude use of a total recapitulation method such that it hamstrings a trial court from considering the specific circumstances presented and achieving the overarching goal of property allocation that is equitable, appropriate and achieves substantial justice between the parties. (Cf. *Beam, supra*, 6 Cal.3d at p. 18 [in apportionment between separate and community property, courts have

"'endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation'"]; *In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 88 [where there are separate and community interests, the court has very broad discretion to fashion allocation that is equitable under the circumstances of the case]; *In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 791 ["disposition of marital property is within the trial court's discretion, by whatever method or formula will 'achieve substantial justice between the parties'"]; *In re Marriage of Brandes, supra,* 239 Cal.App.4th at p. 1478 [hybrid application of *Pereira/Van Camp* approach was appropriate as it achieved substantial justice between the parties, prevented an unfair and "astounding windfall" for the community, and was a considered and fair methodology].)  In assessing whether a tracing method overcomes the presumption that property acquired with commingled funds are community assets, courts retain flexibility to consider any credible evidence, and they may evaluate alternative tracing methods.  (See *Ciprari, supra*, 32 Cal.App.5th at p. 97.)

The circumstances here establish the impossibility of ascertaining the balance of community income and expenses at the time disputed assets were acquired was caused by no fault of Bob.  As such, the total recapitulation method for the whole duration of the marriage remained a viable tracing method from which the court could conclude Brent has met his burden of proof.  (*See, supra*, 64 Cal.2d at p. 783.)  Additionally, the circumstances are markedly distinct from *See.*  Here, there was evidence community expenses routinely exceeded community income, especially in 2015, 2019 and 2020, such that Bob was frequently required to supplement the community with large amounts of his separate property; far from disadvantaging the community or compromising its interests, Bob provided the community with a luxurious standard of living it could not have sustained on community income alone.  He did so to the distinct disadvantage of his separate property interests, not as a means of favoring them.  Moreover, Ebersbacher's annualized recapitulations provided additional support for the trial court's conclusion;

41.

evidence indicates the community was insolvent by the end of 2019, even with the community's modest share of the 2017 bonus. The largest disputed acquisitions occurred in late 2020 when Bob moved about $49 million of the Lyons sale proceeds into family partnership and corporate entities, a logical and predictable reinvestment of his separate property—not as a means to ferret away community funds that already had been extinguished. The trial court did not err in relying on a total recapitulation method to conclude there was no remaining community property to distribute.

## III.    The 2020 Restatement of the Family Trust

Annette claims the trial court erred by declining to void Bob's 2020 restatement of the Family Trust, even though the trial court acknowledged the 2020 restatement was made in violation of the ATRO's created under Family Code section 2040.

### A.    Additional Background

When Annette and Bob each filed for divorce in 2019, the summonses issued in those proceedings included ATRO's under Family Code section 2040, subdivision (a)(4), which prohibits modification of a nonprobate transfer that affects the disposition of property without the other spouse's consent or a court order.

The trial court found that, without Annette's permission or notice to her, Bob modified the Family Trust in May 2020 to remove a $5 million gift to Annette and two $250,000 gifts to her sons. He did so while the ATRO's were in place. The trial court concluded this was a "technical violation" of the ATRO's, but voiding the 2020 restatement was too harsh a remedy, particularly because the harm the statute was designed to prevent was not the type of harm that resulted here.

The trial court observed it could find no case authority holding "that an estate planning document executed by one spouse in violation of an ATRO is voidable by the other spouse. Instead, as argued by [Brent], the ATRO required by [Family Code] Section 2040 is a court order, the violation of which constitutes contempt. (See [Code] Civ. Proc. § 1209.) In turn, the remedies for contempt of orders in marital dissolution

42.

proceedings are expressly dictated by statute, and do not include voiding estate planning (or any other) documents executed in violation of an ATRO." The court concluded no appropriate remedy was specified by statute, and then considered the legislative history and purpose of amendments to Family Code section 2040, which precluded certain types of estate planning changes during dissolution proceedings.

The trial court looked to comments the California Law Revision Commission made in 2000, recommending amendment to Family Code section 2040 to clarify the scope of the family law ATRO (Recommendation: Estate Planning During Marital Dissolution (Oct. 2000) 30 Cal. Law Revision Com. Rep. (2000) (30 Cal. Law Revision Rep. (2000)):

> "In discussions regarding amending [Family Code] Section 2040, the Commission discussed seeking 'to clarify the scope of the [ATRO], consistent with the … principles' that '[t]he ATRO should not restrain changes that cannot dispose of the other spouse's property' but 'should restrain changes that could dispose of the other spouse's property.' ([30 Cal. Law Revision Rep. (2000), *supra*], at p. 605.) The Commission stated such an amendment would allow parties to a dissolution proceeding to avoid unintended transfers, as 'dissolution of marriage will often lead to changes in [a] person's testamentary intentions,' but '[i]f the ATRO prevents a person from making an intended estate planning change and the person dies during the dissolution proceeding, the person's estate will pass in an unintended way.' (*Id.* at p. 608.) [¶] The Commission noted that an amendment along these lines would serve the underlying purposes of the ATRO statute. It would further 'a principal [*sic*] purpose of the ATRO provision[,] … to conserve judicial resources by making automatic those types of restraints that are commonly sought and granted in dissolution proceedings' because if, as appears to be the case, 'parties to a dissolution routinely wish to make estate planning changes during the proceeding, then judicial efficiency is not served by an automatic restraint of such changes.' ([*Id.*] at p. 609.) Moreover, restraining estate planning changes which do not affect the other spouse's property 'exceeds the proper purpose of the ATRO—protecting marital assets from dissipation or concealment.'"

The court relied on this reasoning to conclude voiding the 2020 restatement was too harsh a remedy. The court pointed out that doing so would not protect any marital

property from dissipation or concealment because the 2020 restatement merely revoked the 2019 restatement's gift of $5.5 million of Bob's separate property to Annette and her sons. Further, voiding the 2020 restatement, in the trial court's view, would revive a transfer to Annette and her sons that Bob explicitly stated in his will and in the 2020 restatement he no longer wished to bequeath.

### B. Analysis

Annette argues that because a property transaction that violates a court order is voidable, the trial court erred in failing to void the 2020 restatement of the Family Trust. Merely finding Bob in contempt—which Annette asserts the trial court suggested as a remedy—without voiding the 2020 restatement, makes no sense, according to Annette, where the violation is not discovered until after the violating spouse dies; the violation cannot be remedied *except* by voiding the unlawful act. Annette argues a court cannot hold a deceased person in contempt, and, thus, the only remedy available is voiding the 2020 restatement; not doing so leaves Annette with no remedy whatsoever.

Brent asserts voiding the 2020 restatement is not a remedy contemplated for contempt under Code of Civil Procedure section 1218, subdivision (b), and there is no case authority holding that voiding a document is a permitted remedy, let alone a mandatory one. Further, Brent maintains, even assuming voiding the 2020 restatement is a potential remedy, the trial court exercised its discretion properly in concluding that such a remedy was too harsh.

The summons in a dissolution proceeding must contain a temporary restraining order enjoining, among other things, "both parties from transferring, encumbering, hypothecating, concealing, or in any way disposing of, any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court …." (Fam. Code, § 2040, subd. (a)(2)(A).) Relevant here, the ATRO's preclude both parties "from creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the

transfer, without the written consent of the other party or an order of the court." (*Id.*, subd. (a)(4).) The ATRO's are, "[u]pon filing the petition and issuance of the summons and upon personal service of the petition and summons on the respondent …[,] in effect against the parties until the final judgment is entered or the petition is dismissed, or until further order of the court." (*Id.*, § 233, subd. (a).)

Here, the trial court found Bob violated the ATRO's by modifying the Family Trust through the 2020 restatement, and neither party disputes substantial evidence supports that finding. The disputed question is one of remedy. Notably, Family Code section 2040 provides no mandatory remedies for a violation of the ATRO's. Family Code section 233, which applies to the ATRO's issued under Family Code section 2040 (*id.*, § 231, subd. (a)), provides that a willful and knowing violation of a restraining order (other than those restraining a spouse from removing a child from the state without the written consent of the other party) is punishable as provided in Penal Code section 273.6. Section 273.6 of the Penal Code, however, does not provide an applicable remedy relevant to the violation of Family Code section 2040 involved in this case.[10]

Looking beyond the Family Code itself, violations of court orders may be treated as contempt of court (Code Civ. Proc., § 1209), and mandatory remedies for contempt citations are provided in Code of Civil Procedure section 1218. (See *Goold v. Superior Court* (2006) 145 Cal.App.4th 1, 10 [Legislature intended to remove trial court's discretion to not impose any punishment for contempt findings resulting from violations of Fam. Code orders].) Nevertheless, while the punishments for contempt of a court order in dissolution proceedings are mandatory under Code of Civil Procedure section 1218, subdivision (c), the court still retains discretion to grant probation or a conditional sentence. (*Id.*, subd. (c)(2).)

---

[10] Penal Code section 273.6 punishes intentional and knowing violation of court orders to prevent harassment, disturbing the peace, or threats or acts of violence.

Case authority indicates trial courts have employed various remedies for violations of court orders or injunctions, depending on the circumstances. In the dissolution context where ATRO's have been violated, court orders (1) requiring the violating party to pay restitution (see, e.g., *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1103) and (2) voiding a property conveyance to a trust in violation of the ATRO's (see, e.g., *Raney v. Cerkueira* (2019) 36 Cal.App.5th 311, 317, 330) have been affirmed. More generally, a court's power to set aside or void a conveyance of property in violation of an injunction has long been recognized. (See, e.g., *Powell v. Bank of Lemoore* (1899) 125 Cal. 468, 472; *Warburton v. Kieferle* (1955) 135 Cal.App.2d 278, 283.)

This variance, and the lack of definitive and mandatory remedies applicable to every kind of violation of the ATRO's, indicates the trial court retains broad discretion to select an appropriate remedy that works substantial justice under the circumstances presented. Dissolution cases, and even probate matters such as this, can involve exceedingly contentious and emotional circumstances, and they may present difficult or complex financial aspects. Given this, vesting the trial court with the discretionary power to select an appropriate remedy for violation of the ATRO's—or no remedy at all (outside the context of a contempt citation), depending on the nature of the violation, is not only confirmed by the relevant statutes and case authority discussed *ante*, it is prudent policy. The ATRO's are generally designed to protect spouses' basic parental and financial rights during the dissolution process, and abiding by them is not optional; but remedies for violations of the ATRO's are not to be used as a cudgel to extract punitive financial sanctions from a spouse who commits any violation of them, otherwise the ATRO's themselves become a tool for gamesmanship, creating inequitable outcomes.

Here, Bob's modification to the Family Trust in 2020 without Annette's written consent or an order of the court (Fam. Code, § 2040, subd. (a)(4)), clearly violated the ATRO's as the trial court concluded. Family Code section 2040, subdivision (a)(4), prohibiting the modification of a nonprobate transfer that affects the distribution of

46.

property applies even to modifications that affect only separate property. In recommending amendment to the estate planning ATRO's under Family Code section 2040 in October 2000, the Law Revision Commission Report noted that modification of a nonprobate transfer of separate property does not represent the same risk as one that affects the disposition of community property, yet the "characterization of property as community or separate often involves a complex legal and factual determination that is probably best left to the courts. For this reason, the restraint on modification of a nonprobate transfer should apply to both community and separate property." (30 Cal. Law Revision Rep. (2000), *supra*, at p. 613.) Nevertheless, Bob's violation did not result in dissipation, encumbering, hypothecating, concealing or disposing of any community property. At most, it precluded Annette from a gift of Bob's separate property to which she otherwise had no entitlement—a gift he expressly did not wish to bequeath to her by May 2020.

Annette argues voiding the 2020 restatement is her election to make as a nonconsenting spouse to a transfer of property that violated the ATRO's. However, to the extent setting aside a property transfer may be an appropriate remedy for a violation of the ATRO's in certain circumstances (see e.g., *Raney v. Cerkueira, supra*, 36 Cal.App.5th at p. 317 [trial court cancelled transfer of property to family trust as violative of ATRO's]), we find no statutory or case authority that such a remedy is mandatory, let alone that it is the province of the nonconsenting spouse, rather than the court, to determine the appropriate remedy for a violation of the ATRO's.

Given the circumstances presented, we find no abuse of discretion in the trial court's conclusion that voiding the 2020 restatement was too harsh a remedy.

**DISPOSITION**

The trial court's judgment is affirmed. Respondent is entitled to his costs on appeal.

MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


DeSANTOS, J.